IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 96-50677
_____

SIERRA CLUB; CLARK HUBBS,

                              Plaintiffs-Appellees,

                    v.

DAN GLICKMAN, Secretary, Department
of Agriculture; UNITED STATES
DEPARTMENT OF AGRICULTURE,

                              Defendants-Appellants.

               * * * * * * *
               _____

No. 96-50778
_____

SIERRA CLUB; CLARK HUBBS,

                              Plaintiffs-Appellees,

                    v.

DAN GLICKMAN, Secretary of Agriculture;
UNITED STATES DEPARTMENT OF AGRICULTURE,

                              Defendants-Appellants,

       and

AMERICAN FARM BUREAU FEDERATION,
STATE OF TEXAS,

                    Intervenor/Defendants-Appellants.
               _____

       Appeals from the United States District Court
            for the Western District of Texas
               _____
               September 24, 1998

Before WIENER, EMILIO M. GARZA and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

This is the latest in a series of cases brought by Sierra Club and others concerned about endangered species that depend on water from the Edwards Aquifer for their survival. The appellants, Dan Glickman, the Secretary of the Department of Agriculture, and the United States Department of Agriculture (hereinafter collectively referred to as the "USDA"), appeal from a judgment entered against them on all three counts of the appellees' complaint. For the reasons set forth below, we affirm in part, reverse in part, and dismiss the remainder of the appeal as moot.

## I. Factual Background

The Edwards Aquifer is a 175-mile long underground aquifer that stretches through eight counties in central Texas. The Edwards Aquifer is recharged primarily from surface waters and rainfall seeping through porous earth along its path. Unless removed by human pumping, water in the Edwards Aquifer flows west to east, before turning northeast, where it is discharged through a series of springs on the eastern edge of the aquifer, the two largest of which are the San Marcos Springs in San Marcos and the Comal Springs in New Braunfels. The San Marcos and Comal Springs are the only habitat of five federally endangered and threatened species: the fountain darter, the San Marcos gambusia (which may now be extinct), the San Marcos salamander, the Texas blind salamander, and Texas wild rice (hereinafter collectively referred

- 2 -

to as the "Edwards-dependent species"). <u>See</u> 50 C.F.R. §§ 17.11, 17.12.

The Edwards Aquifer is of great economic significance to the State of Texas. Water from the Edwards Aquifer is used by thousands of farmers to irrigate millions of dollars worth of crops, by over two million people as their primary source of water, and by thousands of businesses upon which the entire central Texas economy depends.

Pumping from the Edwards Aquifer, however, can have significant ecological consequences to the Edwards-dependent species. In times of even mild drought, the springflow at both the San Marcos and Comal Springs can decrease enough to threaten the survival of the Edwards-dependent species. Not surprisingly, given these often competing interests, the Edwards Aquifer has been the focus of extensive efforts to conserve its limited water resources.

In 1993, the Texas Legislature enacted the Edwards Aquifer Act to provide for management of the Aquifer. 1993 Sessions Laws, ch. 626 (S.B. 1477), as amended, 1995 Sessions Laws, ch. 261 (H.B. 3189). In short, the Act imposes a cap on water withdrawals by non-exempt wells and establishes a permit system, which limits the authority of the Edwards Aquifer Authority (charged by the Act with regulating well withdrawals from the Aquifer) to grant permits to new users (defined as those users who were not beneficially using water from the Aquifer before June 1, 1993). Although implementation of the Act was delayed due to administrative and

legal challenges, it is now in force.[1]

In addition to these legislative efforts, Sierra Club and others concerned about the survival of the Edwards-dependent species have brought a series of lawsuits attempting to further regulate water usage from the Edwards Aquifer. See, e.g., Sierra Club v. City of San Antonio, 115 F.3d 311 (5th Cir. 1997); Sierra Club v. City of San Antonio, 112 F.3d 789 (5th Cir. 1997); Sierra Club v. Lujan, 1993 WL 151353 (W.D. Tex. 1993). This is the latest of these lawsuits in this court.

## II. Procedural History

On April 28, 1995, Sierra Club and Clark Hubbs (hereinafter collectively referred to as "Sierra Club") filed a three-count complaint against the USDA. Count I of the complaint alleged violations of the Agriculture and Water Policy Coordination Act, 7 U.S.C. §§ 5401-5405, related provisions that establish a USDA Council on Environmental Quality, 7 U.S.C. §§ 5501-5506, and the Bankhead-Jones Farm Tenant Act, 7 U.S.C. § 1010. Sierra Club asserted that these statutes required the USDA to develop and implement programs to protect waters from contamination and to prevent environmental problems that may result from agricultural production. The complaint alleged that the USDA had unlawfully withheld or unreasonably delayed compliance with these statutes

---

[1] For a thorough description of the Act and the role of the Edwards Aquifer Authority, see Barshop v. Medina Underground Water Cons. Dist., 925 S.W.2d 618, 623-25 (Tex. 1996).

"[a]s respects irrigation, agriculture, [and] pumping from the Edwards."

Count II alleged that the USDA violated § 7(a)(1) of the Endangered Species Act ("ESA"), 15 U.S.C. § 1536(a)(1), by failing to consult with FWS and failing to utilize its authorities to carry out programs for the conservation of the Edwards-dependent species.

Count III alleged that the USDA had violated § 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), by subsidizing or otherwise encouraging agriculture dependent on irrigation from the Edwards Aquifer without either engaging in formal consultation with the United States Fish and Wildlife Service ("FWS") or otherwise insuring that its actions would not cause jeopardy to the Edwards-dependent species.

Sierra Club sought three forms of injunctive relief: first, under the Count I statutes, that the USDA use its authorities under those statutes to carry out programs to conserve the Edwards-dependent species; second, under § 7(a)(1), that the USDA consult with FWS and develop additional programs that may benefit the Edwards Aquifer and the species that depend on it by encouraging farmers to use less irrigation water; and third, under § 7(a)(2), that the USDA consult with FWS regarding conditioning or withholding payments to farmers under current farm legislation in order to encourage greater water conservation efforts.

Shortly after the complaint was filed, the State of Texas and the American Farm Bureau Federation sought to intervene as

defendants. The district court denied both motions. In <u>Sierra Club v. Glickman</u>, 82 F.3d 106 (5th Cir. 1996), however, this court reversed and instructed the district court to allow the State and Farm Bureau to intervene. The State of Texas and the American Farm Bureau Federation are both parties to this appeal.

Before the parties filed motions for summary judgment, Congress enacted the Federal Agriculture Improvement and Reform Act of 1996 ("FAIR Act"), Pub. L. No. 104-127, 110 Stat. 888, which, <u>inter alia</u>, replaced most crop subsidy programs under previous statutes with a new production flexibility contract ("PFC") payment program under which the USDA will pay fixed, declining amounts to eligible producers for a seven-year period. Under the FAIR Act, the USDA does not have discretion to withhold PFC payments or otherwise use those payments to control the irrigation decisions of farmers. The Act requires that the payments be made so long as the statutory prerequisites have been satisfied. <u>See</u> 7 U.S.C. § 7211(a). In short, so long as a farmer agrees to abide by any applicable wetlands or highly erodible lands conservation requirements and not to use the land for non-agricultural commercial or industrial purposes, the USDA must offer to enter into a PFC contract. As the USDA notes, the purpose of this legislation was to achieve a stable transition to a free market regime by providing "guaranteed payments" to all farmers who satisfy objective eligibility requirements. <u>See</u> H.R. Rep. No. 104-462, at 43, 1996 U.S.C.C.A.N. at 615.

In June 1996, after the completion of discovery, the parties filed cross motions for summary judgment. In addition, Sierra Club requested preliminary injunctive relief under Count III against disbursement of the PFC payments to eligible producers until the USDA formally consulted with the FWS.[2]

By order dated July 2, 1996, the court granted Sierra Club's motion for summary judgment on Counts I and II but denied both parties' motions for summary judgment on Count III. In that order, the court ruled, without elaboration, that Sierra Club and Professor Hubbs had standing to pursue this action. With respect to Count I, the court ruled that the USDA "has unlawfully refused or unreasonably delayed developing and implementing . . . plans and/or programs" under the agricultural statutes listed in the complaint. The court then ordered the USDA to: (1) "develop by November 1, 1996, and begin to carry out a program to assist in preserving natural resources and protecting fish and wildlife through land conservation and utilization" pursuant to 7 U.S.C. § 1010; (2) develop and implement a "coordinated, integrated and comprehensive intra-agency program to protect waters from contamination from . . . agricultural production practices," pursuant to 7 U.S.C. § 5501 et seq.; and (3) develop and implement a "detailed plan 'to evaluate, prevent, and mitigate environmental problems that may result from agricultural production,'" pursuant

---

[2] The motions for summary judgment and the Sierra Club's motion for a preliminary injunction focused on the payments to farmers under the FAIR Act.

to 7 U.S.C. § 5403(a)(1).

With respect to Count II, the court declared that the USDA had failed to utilize its authority, pursuant to § 7(a)(1) of the ESA, to carry out programs for the conservation of endangered Edwards-dependent species and had failed to consult with or obtain the assistance of FWS concerning its duties under § 7(a)(1).  The court ordered the USDA to develop by November 1, 1996, in consultation with FWS, "an organized program utilizing USDA's authorities for the conservation of the Edwards-dependent endangered and threatened species."

On July 23 and 24, 1996, a bench trial was held with respect to Count III, and on August 19, 1996, the district court entered findings of fact, conclusions of law, and an injunction.  Although the court acknowledged that the PFC payments must be made to eligible farmers, the court nonetheless found that the "USDA unquestionably now has authority under the 1996 Farm Bill to target monies for designated 'conservation priority areas.'"  The court further found that it was "not called upon to resolve the question of whether and to what extent actions authorized, carried out, or funded by USDA through PFC payments may adversely affect the Edwards-dependent species," because this was a question for the USDA to answer in consultation with FWS.  The court further stated that the USDA had "unreasonably delayed" ESA § 7(a)(2) consultation with respect to both pre-FAIR Act payments and PFC payments under the FAIR Act.  Despite these findings, the court did not enjoin the

payments under the FAIR Act or order that the USDA proceed to formal consultation. Instead, the court simply ordered the USDA to "complete its portion of the informal consultation, including consulting and obtaining the assistance of the USFWS by November 1, 1996."

On September 19, 1996, the court entered judgment. Subsequently, the USDA and the intervenors filed timely notices of appeal and motions for a stay pending appeal. With respect to the motions for a stay, the USDA argued that the district court's judgment forced it to spend a disproportionate amount of its finite resources implementing conservation programs in the Edwards Aquifer area under statutory authorities that do not require action in that area, and interfered with the USDA's efforts to deliver finite resource conservation services in Texas. By order dated October 23, 1996, this court granted the motions for stay pending appeal.

On November 24, 1997, Sierra Club filed a motion to dismiss the appeal as moot. According to Sierra Club, since the appeal was filed, the USDA has taken actions complying with the district court's judgment with respect to its obligations under both § 7(a)(1) and § 7(a)(2). On December 4, 1997, this court heard argument on both the merits of the appeal and Sierra Club's motion to dismiss.

III. <u>Analysis</u>

A. <u>ESA § 7(a)(1)</u>

The USDA first argues that the district court erred in granting Sierra Club relief under § 7(a)(1) of the ESA. Section 7(a)(1) provides, in relevant part:

> All other federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 1533 of this title.

16 U.S.C. § 1536(a)(1). Relying on this language, the district court held that the USDA "has not utilized its authority to carry out programs for the conservation of previously listed Edwards-dependent species as ESA § 7(a)(1) requires" and that it had not consulted with FWS concerning utilizing its authorities to carry out such programs. The court then ordered the USDA to develop, in consultation with FWS, "an organized program for utilizing USDA's authorities for the conservation of the Edwards-dependent endangered and threatened species as contemplated by the ESA."

The USDA seeks to attack the district court's judgment on three grounds. First, the USDA argues that Sierra Club lacks standing to bring this action. Second, the USDA argues that neither the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(1)(A), nor the Administrative Procedure Act, 5 U.S.C. § 706, authorizes judicial review of Sierra Club's claims. Finally, the USDA argues that, to the extent that Sierra Club's claims are judicially reviewable, the district court erred in finding that the USDA has not complied with its duties under § 7(a)(1).

## 1. Mootness

Before addressing the merits of the USDA's appeal, however, we must first address whether the USDA's appeal of Sierra Club's § 7(a)(1) claims is now moot. In its motion to dismiss this appeal, Sierra Club asserts that the USDA may have taken steps to satisfy its consultation obligations under § 7(a)(1). The USDA opposes the motion to dismiss and Sierra Club points to no particular facts that would suggest that this appeal is moot with respect to its § 7(a)(1) claims; rather, Sierra Club argues only that "it is unclear whether the USDA's activities to which USFWS refers satisfy minimum § 7(a)(1) standards." In order to resolve this issue, Sierra Club moves this court to remand this issue to the district court for a factual determination. Because the parties have not provided us with any information suggesting that the USDA has, in fact, complied with its obligations under § 7(a)(1),[3] however, we will address the issues regarding § 7(a)(1) raised on appeal.

## 2. Standing

We first address whether Sierra Club had standing to pursue this action. See Steel Co. v. Citizens for a Better Environment, -- U.S. --, 118 S. Ct. 1003 (1998). At an "irreducible constitutional minimum," to have standing, a plaintiff must establish three elements. First, the plaintiff must show that he

---

[3] This failure to set forth sufficient information with respect to the § 7(a)(1) claims stands in sharp contrast to the specific evidence set forth with respect to the mootness of the USDA's appeal of Sierra Club's § 7(a)(2) claims, discussed infra at Part III.B.

has suffered "an injury in fact -- a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical." Id. at --, 118 S. Ct. at 1016 (internal quotations omitted). Second, the plaintiff must establish "causation -- a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." Id. at --, 118 S. Ct. at 1016. Finally, "there must be redressibility -- a likelihood that the requested relief will redress the alleged injury. Id. at --, 118 S. Ct. at 1017.

At its core, Sierra Club's complaint seeks to have the USDA comply with the procedural requirements of § 7(a)(1). "Although the particular nature of a case does not -- and cannot -- eliminate any of the 'irreducible' elements of standing," Florida Audubon Society v. Bentsen, 94 F.3d 658, 664 (D.C. Cir. 1996), in a procedural rights case, such as this, the plaintiff is not held to the normal standards for redressibility and immediacy, see Lujan v. Defenders of Wildlife, 504 U.S. 555, 573 n.7, 112 S. Ct. 2130, 2143 n.7 (1992). This does not mean, however, that a procedural rights plaintiff has standing merely because of the government's failure to comply with the relevant procedural requirements. See Id. at 573, 112 S. Ct. at 2143. Instead, the plaintiff must show an injury that is both concrete and particular, as opposed to an undifferentiated interest in the proper application of the law. Likewise, the plaintiff must establish that the injury is fairly traceable to the proposed government action or inaction. Finally,

- 12 -

although a procedural rights plaintiff is not held to the normal standards for redressibility, in the sense that the plaintiff need not show that the procedural remedy that he is requesting will in fact redress his injury, the plaintiff must nonetheless show that there is a possibility that the procedural remedy will redress his injury. In order to make this showing, the plaintiff must show that "the procedures in question are designed to protect some threatened concrete interest of [its] that is the ultimate basis of [its] standing." Id. at 573 n.8, 112 S. Ct. at 2143 n.8.

### a. Injury

In this case, Sierra Club alleged and set forth uncontradicted summary judgment evidence that the Edwards-dependent species were at "substantial, imminent risk" of jeopardy. As the USDA itself admits, this constitutes a judicially cognizable injury under the ESA. See Sierra Club v. Morton, 405 U.S. 722, 734, 92 S. Ct. 1361, 1366 (1972). Although we agree that Sierra Club has suffered a judicially cognizable injury in this case, we are compelled to note what we are not deciding today. This case does not present the question of whether a plaintiff could suffer a judicially cognizable injury under § 7(a)(1) merely because the particular species that the plaintiff is concerned about remains on the endangered or threatened species list, as opposed to actually suffering some further identifiable and particularized harm. Thus, we express no opinion as to whether a plaintiff would have standing to claim that a federal agency has not done enough to benefit a

particular species when that species is not in risk of jeopardy or taking or otherwise adversely affected. We likewise express no opinion as to whether a plaintiff could have standing to challenge a decision of a federal agency to adopt, after consultation with FWS, one program over another solely on the grounds that the program not adopted would do more for the recovery of the endangered or threatened species than the program that was adopted, when the program that was adopted would nonetheless either benefit or not adversely affect the species in question.

### b. Causation

The USDA does argue, however, that Sierra Club has not established that its failure to consult and develop programs for the conservation of the Edwards-dependent species has caused Sierra Club's injury. According to the USDA, the injury suffered by Sierra Club is caused by the independent actions (i.e., pumping decisions) of third party farmers, over whom the USDA has no coercive control. Although we recognize that causation is not proven "if the injury complained of is th[e] result [of] the independent action of some third party not before the court," Bennett v. Spear, -- U.S. --, --, 117 S. Ct. 1154, 1164 (1997) (citation and quotation omitted) (emphasis in original), this does not mean that causation can be proven only if the governmental agency has coercive control over those third parties. Rather, the relevant inquiry in this case is whether the USDA has the ability

- 14 -

through various programs to affect the pumping decisions of those third party farmers to such an extent that the plaintiff's injury could be relieved. In this respect, the USDA argues that "the most [that it] could do vis-a-vis farmers would be to encourage them to use water-conservation methods by offering incentives under the discretionary programs described . . . . However, there is no evidence that, if additional incentives were offered, there is a 'substantial likelihood' that injury at the springs would be relieved." As Sierra Club points out, however, this claim is directly contradicted by the summary judgment evidence.

Three pieces of evidence are significant to a finding of causation in this case. The first document is <u>Cooperative Solutions</u>, a 1995 study (updated in 1996) conducted by the USDA in conjunction with Texas A&M University and the Texas State Soil and Water Conservation Board. One of the programs proposed in that study -- providing financial assistance to farmers for the installation of water conservation measures -- would save an estimated 38,000 acre-feet of Edwards irrigation water in an average year. The savings would be even greater in a dry year. Not only does the USDA have the authority to carry out such a program, but the USDA itself has described the proposal as cost-effective.

The second key document is the 1996 Biological Evaluation ("BE"), submitted by USDA to FWS during a § 7(a)(2) consultation concerning crop subsidy payments under the 1990 farm bill.

According to the USDA's irrigation pumping estimates in that BE, 38,000 acre-feet represent 20% of the total Edwards irrigation pumping in dry years, when the threat to the Edwards-dependent species is greatest, and a much greater percentage in an average year.

The final link in this causal chain is FWS's response to the 1996 BE. In its response, FWS concluded that the springflow effects of a 20% reduction in Edwards irrigation pumping would have a significant impact on the Edwards-dependent species. In fact, FWS "categorically" disagreed with the USDA's statement that a 20% decrease in Edwards irrigation pumping would have no significant effect on the Edwards-dependent species. Moreover, the USDA itself acknowledges that "FWS's expertise extends to essentially factual issues regarding how particular actions affect listed species."

Given this evidence, we find the USDA's claim that it has no effect on the irrigation decisions of the farmers to be unpersuasive. To the contrary, the evidence introduced clearly shows that the USDA's failure to adopt any of the above programs is fairly traceable to the injury to the Edwards-dependent species.

### c. Redressibility

Finally, we turn to the question of whether "the procedures in question are designed to protect some threatened concrete interest of [Sierra Club's] that is the ultimate basis of [its] standing." Defenders of Wildlife, 504 U.S. at 573 n.8, 112 S. Ct. at 2143 n.8. In order to make this determination, we necessarily turn to the

language of the statute.  As noted above, § 7(a)(1) provides, in pertinent part, that "[a]ll other federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the <u>conservation</u> of endangered species and threatened species listed pursuant to section 1533 of this title."  16 U.S.C. § 1536(a)(1) (emphasis added).  At first blush, this section appears to suggest that federal agencies have only a generalized duty to confer and develop programs for the benefit of endangered and threatened species -- <u>i.e.</u>, not with respect to any particular species.  If this reading were correct, we would be hard pressed to find standing in this case.[4]

When read in the context of the ESA as a whole, however, we find that the agencies' duties under § 7(a)(1) are much more specific and particular.

> As it was finally passed, the Endangered Species Act of 1973 represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation. Its stated purposes were "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," and "to provide a program for the conservation of such . . . species . . . ." 16

---

[4]  If the statute created only a generalized duty rather than a duty with respect to each endangered and threatened species, it would be pure speculation that an order from this court would remedy the particularized injury alleged by the plaintiff.  Unlike other procedural rights cases in which the consultation ordered would necessarily take into account the plaintiff's particularized injury, a duty to consult as to endangered and threatened species in a general sense would not necessarily address the specific injury alleged by the plaintiff. On the other hand, to the extent that the plaintiff alleged an interest in all endangered and threatened species based upon a systematic failure by a federal agency to consult as to endangered and threatened species in general, we note that such an injury would likely constitute a generalized grievance.

- 17 -

U.S.C. § 1531(b) (1976 ed.). In furtherance of these goals, Congress expressly stated in § 2(c) that "all Federal departments and agencies <u>shall seek to conserve endangered species</u> and threatened species . . . ." 16 U.S.C. § 1531(c) (1976 ed.). Lest there be any ambiguity as to the meaning of this statutory directive, the Act specifically defined "conserve" as meaning "to use and the use of <u>all methods and procedures which are necessary to bring any endangered species or threatened species</u> to the point at which the measures provided pursuant to this chapter are no longer necessary." § 1532(2).

<u>TVA v. Hill</u>, 437 U.S. 153, 180, 98 S. Ct. 2279, 2294-95 (1978) (emphasis supplied by Supreme Court). We find the Supreme Court's examination of the meaning of "conserve" to be instructive as to the meaning of "conservation" under § 7(a)(1). By imposing a duty on all federal agencies to use "all methods and procedures which are necessary to bring <u>any</u> endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary," 16 U.S.C. § 1532(2) (emphasis added), Congress was clearly concerned with the conservation of each endangered and threatened species. To read the command of § 7(a)(1) to mean that the agencies have only a generalized duty would ignore the plain language of the statute.

That § 7(a)(1) imposes a duty on all federal agencies to consult and develop programs for the conservation of each endangered and threatened species is further supported by a statement made by Representative Dingell, the House manager of the bill, who stated:

[Section 7] substantially amplifie[s] the obligation of [federal agencies] to take steps within their power to carry out the purposes of this act. A recent article . . .

- 18 -

illustrates the problem which might occur absent this new
language in the bill. . . .

Another example  . . .  [has] to do with the continental
population of grizzly bears which may or may not be
endangered, but which is surely threatened.  . . .  Once this
bill is enacted, the appropriate Secretary, whether of
Interior, Agriculture or whatever, <u>will have to take action</u> to
see that this situation is not permitted to worsen, and that
these bears are not driven to extinction.  The purposes of the
bill included the conservation of the species and of the
ecosystems upon which they depend, and <u>every agency of
government is committed</u> to see that those purposes are carried
out.  . . .  [T]he agencies of Government can no longer plead
that they can do nothing about it.  <u>They can, and they must.
The law is clear.</u>

TVA v. Hill, 437 U.S. at 183-84, 98 S. Ct. at 2296 (citing 119

Cong. Rec. 42913 (1973)) (emphasis added by the Supreme Court).

Surely if each federal agency is required to take whatever action

necessary to conserve the grizzly bear, then each federal agency

must also be required to take whatever actions are necessary to

ensure the survival of each endangered and threatened species.  If

Congress was solely concerned with the conservation of the grizzly

bear, it could have written a statute much more narrow in scope.

Given the plain language of the statute and its legislative

history, we conclude that Congress intended to impose an

affirmative duty on each federal agency to conserve each of the

species listed pursuant to § 1533.  In order to achieve this

objective, the agencies must consult with FWS as to each of the

listed species, not just undertake a generalized consultation.[5] Consequently, we conclude that the procedures in question were designed to protect Sierra Club's threatened concrete interest in this case.  Accordingly, we conclude that Sierra Club has standing to pursue this action.

## 2.  ESA Citizen Suit Provision & the APA

The USDA next argues that neither the citizen suit provision of the EPA nor the APA supports Sierra Club's complaint under § 7(a)(1).  The citizen suit provision of the ESA provides that any person may commence a civil suit

> to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof . . . .

16 U.S.C. § 1540(g)(1)(A).  Relying on the Supreme Court's recent decision in Bennett v. Spear, -- U.S. --, 117 S. Ct. 1154 (1997), the USDA argues that this provision cannot be used to challenge the failure of a federal agency to follow the affirmative requirements of § 7(a)(1).  The USDA has misread the reach of Bennett.  In Bennett, the Supreme Court held only that § 1540(g)(1)(A) "is not an alternative avenue for judicial review of the Secretary[ of the

---

[5]  Of course, this duty to consult and duty to conserve is tempered by the actual authorities of each agency.  See Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC, 962 F.2d 27, 34 (D.C. Cir. 1992) (holding that § 7(a)(1) does not expand an agency's existing authorities to conserve endangered species).  Whether a particular agency has the authority and/or ability to adopt programs for the benefit of a particular species, however, is a question on the merits, not relevant to a standing inquiry.

Interior's] implementation of the statute." Id. at --, 117 S. Ct. at 1166. To hold otherwise, the Supreme Court reasoned, would be "incompatible with the existence of § 1540(g)(1)(C), which expressly authorizes suit against the Secretary [of the Interior], but only to compel him to perform a nondiscretionary duty under § 1533. That provision would be superfluous -- and, worse still, its careful limitation to § 1533 would be nullified -- if § 1540(g)(1)(A) permitted suit against the Secretary [of the Interior] for any 'violation' of the ESA." Id. at --, 117 S. Ct. at 1166. The Supreme Court did, however, agree with the government that § 1540(g)(1)(A) "is a means by which private parties may enforce the substantive provisions of the ESA against any regulated party -- both private entities and Government agencies." Id. at -, 117 S. Ct at 1166 (emphasis added). Given this reasoning and the Court's specific focus on the Secretary of the Interior, we find the government's reliance on Bennett unpersuasive. Finding no other persuasive reasons offered in support of the government's position, and in light of the clear language of the statute, we conclude that the ESA's citizen suit provision supports Sierra Club's cause of action under § 7(a)(1).

Even assuming that the citizen suit provision of the ESA did not support Sierra Club's cause of action under § 7(a)(1),[6] we

---

[6] Given our conclusion that Sierra Club's cause of action under § 7(a)(1) can be brought pursuant to the citizen suit provision of the ESA, we normally would not address whether Sierra Club could also maintain that action under the APA. By its terms, the APA provides a right to judicial review of all "final agency action for there is no other remedy in a court." 5 U.S.C. § 704. We

would nonetheless find that its cause of action could be brought under the APA.  Under the APA, any person "adversely affected or aggrieved by agency action," 5 U.S.C. § 702, may petition a court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or to "compel agency action unlawfully withheld."  5 U.S.C. § 706.  In this case, the USDA does not dispute that Sierra Club is a person adversely affected or aggrieved within the meaning of § 7(a)(1).  The USDA does, however, challenge the applicability of the APA on two other grounds.

First, the USDA argues that its duties under § 7(a)(1) are not judicially reviewable because there is "no law to apply."  In general, there is no law to apply if the statute is drawn in such broad terms that in a given case there would be nothing against which a court could measure agency compliance with the statute. See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410-11, 91 S. Ct. 814, 820 (1971).  The USDA's argument in this respect, however, relies, in large part, on its argument that § 7(a)(1) does not impose a duty on the federal agencies to consult with FWS and develop programs for the conservation of each of the endangered and threatened species.  As noted above in our standing discussion, however, we find that § 7(a)(1) contains a clear statutory directive (it uses the word "shall") requiring the

nevertheless address the USDA's arguments under the APA because we find those arguments equally applicable to the citizen suit analysis.

- 22 -

federal agencies to consult and develop programs for the conservation of each of the endangered and threatened species listed pursuant to the statute. That Congress has passed a statute that is exceptionally broad in its effect, in the sense that it imposes a tremendous burden on the federal agencies to comply with its mandate, however, does not mean that it is written in such broad terms that in a given case there is no law to apply. On the contrary, given the specific requirements of § 7(a)(1), in any given case there is more than enough law against which a court can measure agency compliance.

The USDA next argues that its duties under § 7(a)(1) are not judicially reviewable because it has a substantial amount of discretion in developing programs for the benefit of the Edwards-dependent species. According to the USDA, because it enjoys a substantial amount of discretion as to ultimate program decisions, it has unreviewable discretion to ignore § 7(a)(1) altogether. This argument is entirely without merit. A mission agency's discretion to make the final substantive decision under its program authorities does not mean that the agency has unlimited, unreviewable discretion. See Bennett v. Spear, -- U.S. at --, 117 S. Ct. at 1166 ("It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decision making."); Citizens to Preserve Overton Park, 401 U.S. at 410-11, 91 S. Ct. at 820. Instead, it means that the court conducting

- 23 -

judicial review must require the agency to show that it has considered the relevant factors and followed the required procedures, but that, if the agency has done so, the court may not substitute its judgment on the merits for the agency's judgment. See Citizens to Preserve Overton Park, 401 U.S. at 412-15, 91 S. Ct. at 822-23.[7]

In sum, we find that Sierra Club's cause of action under § 7(a)(1) is maintainable under the citizen suit provision of the ESA, and, even assuming that the citizen suit provision of the ESA did not support Sierra Club's cause of action under § 7(a)(1), this action could be maintained under the APA.

### 3.  USDA Compliance

We turn next to the government's argument that it has complied with the requirements of § 7(a)(1) because the Edwards-dependent species have experienced incidental benefits from national USDA programs designed and carried out for other purposes.  As Sierra

---

[7]  The USDA also contends that Sierra Club may not obtain judicial review under the APA on the grounds that there is no "final agency action," 5 U.S.C. § 706.  Although the USDA does not set forth this argument in detail, it appears that the USDA is arguing that agency inaction can constitute "final agency action" only when there is a specific deadline for that action.  The authority cited by the USDA in support of this argument, Brock v. Pierce County, 476 U.S. 253, 260 n.7, 106 S. Ct. 1834, 1839 n.7 (1986), however, stands for no such broad proposition.  Moreover, we find the USDA's cursory argument to be entirely unconvincing.  As noted above, under § 7(a)(1), each federal agency must consult with FWS and develop programs for the conservation of each endangered species that it can affect within its authorities. In this case, Sierra Club introduced evidence indicating that the USDA had never consulted with respect to any endangered or threatened species, let alone with respect to the Edwards-dependent species.  Sierra Club also submitted evidence indicating that the USDA had no plans to begin such consultation in the future.  Clearly the passage of over 25 years without any action whatsoever with respect to any endangered or threatened species qualifies as "final agency action."

Club points out, however, the USDA's position directly conflicts with the plain language of § 7(a)(1), which requires each federal agency "in consultation with and with the assistance of [FWS]" to adopt programs "for the conservation of endangered species." The USDA simply cannot read out of existence § 7(a)(1)'s requirement that the USDA's substantive conservation programs for the Edwards-dependent species be carried out "in consultation with and with the assistance of [FWS]." In this case, there is no real dispute that the USDA has never fulfilled its obligations under § 7(a)(1) with respect to the Edwards-dependent species. Accordingly, we find the USDA's argument unavailing.

### 4. Scope of the Injunction

As a final matter, we note that the USDA has not challenged the scope of the district court's injunction with respect to § 7(a)(1). Thus, we need not address whether the district court properly ordered the USDA to develop, in consultation with FWS, "an organized program for utilizing USDA's authorities for the conservation of the Edwards-dependent endangered and threatened species as contemplated by the ESA."

### B. ESA § 7(a)(2)

The USDA also appeals the district court's judgment with respect to Sierra Club's claims under § 7(a)(2) of the ESA. Section 7(a)(2) provides:

> Each federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter

in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (b) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C. § 1536(a)(2). Sierra Club claimed that the USDA breached its duties under § 7(a)(2) by making payments under the 1996 FAIR Act without engaging in formal consultation with FWS or otherwise ensuring that these payments would not cause jeopardy to Edwards-dependent species. The district court agreed, finding that "payments through the 1996 farm bill to producers over the next seven years may adversely affect Edwards-dependent species, . . . constitute irreversible and irretrievable commitments of resources, . . . [and] foreclose reasonable and prudent alternatives to conservation of the Edwards Aquifer." Based on these findings, the court ordered the USDA to complete informal consultation by November 1, 1996.

The USDA seeks to attack this judgment on three grounds. First, the USDA argues that Sierra Club does not have standing to pursue this claim under § 7(a)(2). In particular, the USDA argues that Sierra Club's claim that the USDA injures Edwards-dependent species by subsidizing pumping raises issues of traceability and redressibility, because the direct source of the alleged harm is not the USDA's actions, but the pumping activities of area farmers

who are not before this court. Second, the USDA argues that § 7(a)(2) does not apply to the PFC payments in question because § 7(a)(2) does not apply to nondiscretionary federal actions. See 50 C.F.R. § 402.03 ("Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control."). Finally, the USDA argues that the pumping by farmers is not "action authorized, funded, or carried out" by a federal agency, and, thus, not subject to § 7(a)(2) consultation. We need not reach these issues, however, because we find the USDA's appeal with respect to § 7(a)(2) moot.

On November 24, 1997, Sierra Club filed a motion to dismiss this appeal with respect to § 7(a)(2) on the grounds that, while the appeal was pending, the USDA completed its Biological Evaluation of the impact that the PFC payments would have on Edwards-dependent species and submitted it to the FWS. In short, the Biological Evaluation concludes that the PFC payments would not adversely affect Edwards-dependent species. By letter dated November 6, 1998, FWS concurred in the USDA's conclusion. Sierra Club now argues that this appeal is moot with respect to its § 7(a)(2) claims because the USDA has complied with the district court's order on this issue.

In general, a matter is moot for Article III purposes if the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. See Campanioni v. Barr, 962 F.2d 461, 464 (5th Cir. 1992). By submitting the Biological

Evaluation to FWS, the USDA clearly fulfilled whatever obligations it had as a result of the district court's order to complete informal consultation. In addition, because FWS concurred in the USDA's conclusion, formal consultation is not required. See 50 C.F.R. § 402.13(a). Thus, there is no relief that can be obtained from this court.

Nonetheless, the USDA contends that this case is not moot on two grounds. First, the USDA argues that this case is not moot because there is a live controversy as to whether Sierra Club has standing to bring this action. According to the USDA, this court "has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review.'" Bender v. Williamsport Area Sch. Dist., 475 U.S. 543, 541, 106 S. Ct. 1326, 1331 (1986) (quoting Mitchell v. Maurer, 293 U.S. 237, 244, 55 S. Ct. 162, 165 (1934)). Although we recognize that the Supreme Court has recently held that federal courts must be certain that a plaintiff has standing before addressing the merits of a particular case, see Steel Co. v. Citizens for a Better Environment, -- U.S. --, 118 S. Ct. 1003 (1998), we do not read that case as making standing the threshold issue that a court must address; rather, we read that case as making Article III jurisdiction, of which standing, mootness, and ripeness are equally important parts, the threshold issue that a court must address. When two or more Article III jurisdictional grounds are presented to the court as grounds for dismissing the action, we do not think

- 28 -

that the court need address all of those arguments or address the arguments in any particular order. Compare Marathon Oil Co. v. Ruhrgas, 1998 WL 329842 (5th Cir. 1998) (en banc) (confirming the primacy of deciding Article III subject matter jurisdiction issues prior to personal jurisdiction issues, which arise out of the due process clause of the Fourteenth Amendment). Accordingly, we reject the USDA's argument that there is an ongoing live controversy before this court with respect to Sierra Club's § 7(a)(2) claims.

Alternatively, the USDA argues that this appeal falls under the exception to the mootness doctrine in that this controversy is capable of repetition but evading review. See Henschen v. City of Houston, 959 F.2d 584, 589 (5th Cir. 1992). In short, the USDA argues that this court must determine whether plaintiffs may bring a challenge under § 7(a)(2) to nondiscretionary payments under the FAIR Act of 1996 so that it will not have to defend future suits by the plaintiffs. In making this argument, the USDA turns this exception on its head. In general, the exception is designed to allow plaintiffs to obtain a judgment in cases where "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subject to the same action again." Murphy v. Hunt, 455 U.S. 478, 482, 102 S. Ct. 1191, 1183 (1982) (quotation omitted). By its very terms, the exception is designed to protect plaintiffs; it is not

designed to protect defendants from the possibility of future lawsuits, when the sole reason that the case is moot is a direct result of the defendant's voluntary compliance with the district court's order.

As a final matter, the USDA argues, relying on United States v. Munsinger, Inc., 340 U.S. 36, 71 S. Ct. 104 (1950), that, in the event that we find the § 7(a)(2) issue moot, we should remand with instructions to vacate that part of the district court's judgment. In U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership, 513 U.S. 18, 115 S. Ct. 386 (1994), however, the Supreme Court held that, where mootness results from the voluntary actions of the losing party, such party has "forfeited his legal remedy by the ordinary processes of appeal or certiorari, thereby surrendering his claim to the equitable remedy of vacatur." Id. at 24, 115 S. Ct. at 392. Because this issue has been rendered moot by the USDA's voluntary compliance with the district court's judgment, we decline to direct the district court to vacate its judgment in this case with respect to § 7(a)(2).[8]

## C.  Count I Statutes

We turn next to the USDA's argument that the district court erred in finding that the USDA had unlawfully refused or

---

[8]  In declining to vacate the district court's judgment, however, we express no opinion as to the propriety of the district court's conclusion that Sierra Club had standing to pursue its claims under § 7(a)(2).  In the event that Sierra Club subsequently moves for an award of attorney's fees, the district court should reexamine its conclusion that Sierra Club had standing to pursue this claim in light of the standing analysis set forth in Part III.A.2 of this opinion.

unreasonably delayed developing and implementing programs under the following statutes: (1) the Agriculture and Water Policy Coordination Act, 7 U.S.C. §§ 5401-5405; (2) related provisions that establish a USDA Council on Environmental Quality, 7 U.S.C. §§ 5501-5506; and (3) the Bankhead-Jones Farm Tenant Act, 7 U.S.C. § 1010 (collectively referred to as the "Count I statutes"). The district court found that these statutes required the USDA to develop and implement programs to protect waters from contamination and to prevent environmental problems that may result from agricultural production as it relates to Edwards-dependent species.

As before, we begin our analysis by examining whether Sierra Club had standing to bring these claims. This inquiry is relatively straightforward. Unlike the evidence it presented with respect to § 7(a)(1), Sierra Club has failed to set forth any evidence showing that its injury at the springs is fairly traceable to the USDA's failure to implement the Count I statutes. Likewise, Sierra Club has failed to demonstrate in any way that an order requiring the USDA to comply with the Count I statutes would redress its injury at the springs. In the end, as Sierra Club itself tacitly admits in its brief, Sierra Club has set forth nothing more than a generalized grievance. Thus, these claims fall squarely within the rule reiterated in Defenders of Wildlife that "a plaintiff raising only a generally available grievance about government -- claiming harm and relief that no more directly or tangibly benefits him than it does the public at large -- does not

state an Article III case or controversy." 504 U.S. at 573-74, 112 S. Ct. at 2143. Accordingly, we reverse the judgment of the district court with respect to the Count I statutes and render judgment on those claims in favor of the USDA.

## IV. Conclusion

For the reasons set forth above, we AFFIRM the judgment of the district court with respect to its finding that the USDA has not complied with its duties under § 7(a)(1) of the ESA, REVERSE the decision of the district court with respect to its findings as to the Count I statutes on the grounds that Sierra Club lacked standing to bring a cause of action under those statutes, and DISMISS the USDA's appeal with respect to Sierra Club's § 7(a)(2) claims as MOOT. Consequently, this case is REMANDED for further proceedings not inconsistent with this opinion.