REVISED SEPTEMBER 13, 1999

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 97-41274

SIERRA CLUB; WILDERNESS SOCIETY;
TEXAS COMMITTEE ON NATURAL RESOURCES,

Plaintiffs-Appellees,

versus

R. MAX PETERSON; ET AL.,

Defendants,

DANIEL GLICKMAN, In his official capacity
as the Secretary of the Department of Agriculture;
GLORIA MANNING, In her official capacity
as the Acting Regional Forester, U S Forest Service,
Region 8; MICHAEL DOMBECK, In his official capacity
as Chief, U S Forest Service; RONALD RAUM,
In his official capacity as the Forest Supervisor,
National Forests and Grasslands in Texas,

Defendants-Appellants,

TEXAS FORESTRY ASSOCIATION;
SOUTHERN TIMBER PURCHASERS COUNCIL,

Intervenor-Defendants-Appellants.

Appeals from the United States District Court
for the Eastern District of Texas

August 16, 1999

Before POLITZ, EMILIO M. GARZA and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

This case is the latest iteration of a fourteen-year dispute between several environmental groups (the Sierra Club, the Wilderness Society, and the Texas Committee on Natural Resources ("TCONR"), collectively, "Appellees," or, "environmental protection organizations") and the U.S. Department of Agriculture, through the U.S. Forest Service ("Forest Service"). Also participating in this litigation since 1993 and for purposes of this appeal are the Texas Forestry Association and the Southern Timber Purchasers Council (collectively, "Timber Intervenors," and, with the Forest Service, "Appellants"). Although the parties dispute how to characterize the district court's actions in this case—whether the court conducted a "*de novo* trial" or merely "took evidence"—both sides agree, in broad terms, that the crux of this appeal is whether the National Forest Management Act of 1976 ("NFMA"), Pub. L. No. 94-588, 90 Stat. 2949 (codified at 16 U.S.C. § 1604 (1994)), contains substantive requirements that a court may enforce through the mechanism of an injunction after conducting a bench trial. The district court found that it did and enjoined timber harvesting in the affected National Forests as a result of the Forest Service's failure to comply with various Congressional mandates. Because we believe that this ruling, and the court's decision to collect information itself that enabled it to arrive at this conclusion, was appropriate, we affirm the judgment of the district court.

## I

The factual background to this case concerns the responsibilities of the Forest Service with respect to the maintenance and management of the National Forests in Texas. Before addressing the specific events precipitating this lawsuit, we believe it important to describe the history of the National Forest System and the role that Congress has required the Forest Service to play in their

management.

## A

The National Forest System, which is administered by the Forest Service, was established in the latter part of the nineteenth century "for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States." Organic Administration Act of 1897 § 1, 16 U.S.C. § 475 (1994). Over a half-century later, Congress broadened the permissible uses of National Forests with the Multiple-Use Sustained-Yield Act of 1960, Pub. L. No. 86-517, 74 Stat. 215 (codified at 16 U.S.C. §§ 528-531 (1994)), and, in 1974, it enacted the Forest and Rangeland Renewable Resources Planning Act ("RPA"), Pub. L. No. 93-378, 88 Stat. 476 (codified at 16. U.S.C. §§ 1600-1614 (1994)). In 1976, the NFMA amended the RPA. Because of widespread public distress and scientific concern over the Forest Service's post-World War II shift to massive, heavily-subsidized timber production in the National Forests,[1] Congress for the first time required the Forest Service to implement a "land and resource management plan" ("LRMP") for each national forest or group of national forests. See NFMA § 6(a), 16 U.S.C. § 1604(a). This management plan must "provide for multiple use and sustained yield of the products" from the national forests, id. § 6(e)(1), 16 U.S.C. § 1604(e)(1), and must be accompanied by regulations that "specify[] guidelines for land management plans," id. § 6(g)(3), 16 U.S.C. § 1604(g)(3). If more destructive techniques such as even-aged management[2] are

---

[1]A significant component of this shift was a change from selection harvesting to clearcutting, a concededly much more destructive form of timber management. Clearcutting and other forms of even-aged management, see *infra* note 2 and accompanying text, result in the removal of almost all above-ground woody vegetation.

[2]"Even-aged management" refers to a forest management system in which a stand of timber of generally uniformly-aged trees is maintained through maturity. See 36 C.F.R. § 219.3. Even-aged

3

to be employed, then they must be carried out consistent with soil and watershed protection, and the harvesting must be monitored to note the effects of the practices on key resources and wildlife. See id. § 6(g)(3)(F), 16 U.S.C. § 1604(g)(3)(F).

The LRMP planning regulations are codified at 36 C.F.R. pt. 219 (1999). The regulations state that the "[p]lans guide all natural resource management activities and establish management standards and guidelines for the National Forest System" and that "[t]hey determine resource management practices, levels of resource production and management, and the availability and suitability of lands for resource management." 36 C.F.R. § 219.1(b). The regulations cover, *inter alia*, general procedures, content, and process requirements for forest planning. They require that an LRMP incorporate the establishment of forest-wide multiple-use goals and objectives,[3] see id. § 219.11(b);

---

methods are clearcutting, seedtree cutting, or shelterwood cutting. Clearcutting involves removing most or all of the merchantable trees, followed by site preparation, and then regeneration, usually requiring planting. Seedtree cutting involves removing most of the merchantable trees, leaving approximately 10 trees per acre to produce seed to regenerate the next stand. Shelterwood cutting involves leaving approximately 20 trees per acre for the dual purpose of providing seed for regeneration and some shelter for the regenerating trees. See Sierra Club v. Espy ("Sierra Club I"), 38 F.3d 792, 795-96 (5th Cir. 1994).

"Even-aged management" may be contrasted with "uneven-aged management," also known as "selection management." Uneven-aged management encompasses both single tree selection and group selection and results in stands containing trees of different ages. Group selection involves cutting small patches of trees, while single tree selection involves selecting particular trees for cutting. See 36 C.F.R. § 219.3.

[3]Section 219.27 sets out minimum specific management requirements to be met in accomplishing the goals and objectives of the National Forest System. These requirements "guide the development, analysis, approval, implementation, monitoring and evaluation of forest plans," 36 C.F.R. § 219.27, and include provisions regarding the conservation of soil and water resources. For example,

(1) § 219.27(a)(1): "All management prescriptions shall [c]onserve soil and water resources and not allow significant or permanent impairment of the productivity of the land."

(2) § 219.27(b)(5): management prescriptions that involve vegetative manipulation of tree cover shall "[a]void permanent impairment of site productivity and ensure conservation of soil and water resources."

(3) § 219.27(c)(6): "Timber harvest cuts designed to regenerate an even-aged stand of timber

4

of forest-wide management requirements in the form of standards and guidelines, see id. §§ 219.13–.27; and of management area direction and prescriptions applying to future management activities in that management area, see id. § 219.11(c).  Each LRMP shall also contain "[m]onitoring and evaluation requirements that will provide a basis for periodic determination and evaluation of the effects of management practices."  Id. § 219.11(d).

Also of relevance to the instant dispute is § 219.19, which concerns fish and wildlife resources. It provides that "[f]ish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area."  Id. § 219.19.  This subsection then introduces the concept of "management indicator species" ("MIS") by providing that

> [i]n order to estimate the effects of each alternative [considered in the draft and final LRMPs and accompanying environmental impact statements] on fish and wildlife populations, certain vertebrate and/or invertebrate species present in the area shall be identified and selected as management indicator species and the reasons for their selection stated.  These species shall be selected because their population changes are believed to indicate the effects of management activities.

Id. § 219.19(a)(1).  The subsection further provides that "[p]opulation trends of the management indicator species will be monitored and relationships to habitat changes determined."  Id. § 219.19(a)(6).

**B**

The Forest Service administers approximately 639,000 acres of National Forest lands in eastern

---

shall be carried out in a manner consistent with the protection of soil, watershed, fish and wildlife, recreation, and aesthetic resources, and the regeneration of timber resources."
(4) § 219.27(e): concerns riparian areas and provides that special attention be given "to land and vegetation for approximately 100 feet from the edges of all perennial streams, lakes, and other bodies of water" and precludes management practices having certain adverse impacts on such waterbodies.
(5) § 219.27(f): provides additional instruction applicable to the conservation of soil and water resources.

Texas. These National Forest lands are divided into four National Forests: the Sam Houston, the Angelina, the Sabine, and the Davy Crockett ("Texas National Forests"). Almost all of what are now the national forest lands in eastern Texas were purchased by the United States in the 1930s and 1940s pursuant to the Weeks Act of 1911 § 6, ch. 186, 36 Stat. 961 (codified as amended at 16 U.S.C. § 515 and scattered sections (1994)). Today, the National Forest lands comprise approximately 37% of the total amount of land within the forests' proclamation boundaries.

Most of the forested lands in eastern Texas were intensively logged near the turn of the century while they were still in non-federal ownership. Consequently, the present timber stands on the national forest lands are comprised mostly of second growth. The Forest Service began practicing even-aged timber management techniques in the Texas National Forests in the early 1960s.

## II

The arduous trek of this case through the court system began on April 17, 1985, when the environmental protection groups first challenged the Forest Service's administration of the National Forests in Texas.[4] Early on, Appellees frequently prevailed at the district court on discrete issues: the district court preliminarily enjoined the Forest Service to follow strictly its own guidelines in cutting pine trees to control the spread of the Southern Pine Beetle, see Sierra Club v. Block, 614 F. Supp. 134, 141 (E.D. Tex. 1985); and the district court enjoined the Forest Service from clearcutting practices within 100 yards of a red-cockaded woodpecker colony, see Sierra Club v. Block, 694 F.

---

[4]While not directly relevant to the instant matter, the history of the proceedings from 1985 through 1993 is described in this court's decision in Sierra Club I, 38 F.3d at 796-98. Primarily, the suit focused on the Forest Service's practice of cutting trees within the wilderness area of the four Texas National Forests to control the Southern Pine Beetle; this practice affected other species as well, most importantly the red-cockaded woodpecker, an endangered species. See Sierra Club I, 38 F.3d at 796; see also Endangered Species Act of 1973 § 2, 16 U.S.C. §1531(a) (1994) (requiring protection of endangered species such as this woodpecker).

6

Supp. 1255, 1256 (E.D. Tex. 1987) (Parker, J.).

After 1987, the proceedings diverged along two separate, yet parallel, tracks. On the first were Appellees' claims that even-aged management techniques violated the NFMA and its associated regulations. The second track concerned Appellees' efforts to protect the habitat of the red-cockaded woodpecker. While the instant case represents the terminus of that first line, we will summarize below the procedural history of the twin paths of this litigation, first addressing the woodpecker litigation.

### A

Beginning in 1987, Appellees[5] sought review of the Texas Forest Plan of 1987 ("1987 Plan"), issued pursuant to NFMA § 6, 16 U.S.C. § 1604, and the focus of the litigation shifted in part from protecting the habitats of specific species to questioning the legitimacy of the Forest Service's practices as a whole. Originally, the district court partially dismissed Appellees' challenge to the validity of the 1987 Plan for failure to exhaust administrative remedies. See Sierra Club v. Lyng, 694 F. Supp. 1256, 1259 (E.D. Tex. 1988) (Parker, J.). Several months later, however, having conducted a trial on the matters which were ripe for judicial determination, the district court found the Forest Service to be in violation of the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. §§ 1531-1543 (1985) with respect to the red-cockaded woodpecker and permanently enjoined the Forest Service's even-aged management techniques, requiring the Forest Service to produce a comprehensive new plan to provide protection for the woodpecker. See Sierra Club v. Lyng, 694 F. Supp. 1260, 1269-73, 1277-78 (E.D. Tex. 1988) (Parker, J.). The district court subsequently rejected that new plan.

---

[5]For simplicity's sake, the action of any individual Appellee is attributed to all Appellees. For instance, only TCONR initially challenged the 1987 Plan, but now each Appellee has as its rallying cry the injunction of the 1987 Plan.

On appeal from those two orders, this court affirmed in part and vacated in part. See Sierra Club v. Yeutter, 926 F.2d 429 (5th Cir. 1991). We found that the district court correctly enjoined the Forest Service from violating the ESA but impermissibly dictated the result of an administrative process by requiring the Forest Service to proceed with developing a new plan in a predetermined manner. See id. at 439-40.

In the interim, the Forest Service determined that it would issue a new LRMP in light of the continuing litigation.[6] In 1992, the Forest Service sought the district court's approval of Interim Guidelines for the protection and management of the red-cockaded woodpecker's habitat and requested that the district court lift its injunction barring the agency from adopting the Interim Guidelines. The district court reviewed the Interim Guidelines and held that they, too, violated the Endangered Species Act. The Forest Service appealed that decision, and this court vacated and remanded once again. See Sierra Club v. Glickman, 67 F.3d 90, 97 (5th Cir. 1995).

**B**

On the parallel line, and the more significant one for the instant case, the Forest Service determined while developing its Interim Guidelines that, pending the completion of the new plan, decisions regarding the selection of timber management systems would be made at the site-specific level, and that even-aged timber management harvesting could be employed if the Forest Service determined it to be appropriate to meet the objectives and requirements of the 1987 Plan.

Appellees objected to this determination, arguing anew that even-aged timber management, as practiced in Texas National Forests, was in violation of the NFMA. In an amended complaint, Appellees requested a preliminary injunction barring the Forest Service from proceeding with certain

---

[6]That revised LRMP for Texas National Forests was not issued until March 28, 1996.

8

proposed timber sales that called for even-aged harvesting. The district court granted that injunction with respect to nine timber sales, see Sierra Club v. Espy, 822 F. Supp. 356, 370 (E.D. Tex. 1993) (Parker, C.J.), but this court vacated and remanded,[7] see Sierra Club v. Espy, 38 F.3d 792, 803 (5th Cir. 1994) ("Sierra Club I").

In Sierra Club I, we held that the district court erred as a matter of law by restricting even-aged timber management in the Texas National Forests to exceptional circumstances because the NFMA does not prohibit such techniques. See id. at 795-96. Additionally, the court determined that the district court abused its discretion by concluding, contrary to the Forest Service's expert determination, that timber sales from even-aged management conflicted with the NFMA.[8] See id. at 798-802. Finally, the court held that the environmental assessments prepared by the Forest Service for timber sales appeared likely to satisfy statutory requirements, and thus, the environmental protection groups were not entitled to a preliminary injunction against the sales. See id. at 802-03.

After the Sierra Club I remand, the environmental protection organizations argued that the Forest Service's on-the-ground activities in carrying out even-aged timber management practices in site-specific areas violated the NFMA with respect to the diversity of plant and animal communities and the protection of resources in specific areas of the Texas National Forests, see 16 U.S.C. §§ 1604(g)(3)(B), (F)(v), and also with respect to inventorying and monitoring for diversity and resource

[7]While review of the 1993 district court order was pending, the Timber Intervenors moved to intervene in the action, which the district court denied. This court reversed, holding that the Timber Intervenors were allowed to intervene as of right. See Sierra Club v. Espy, 18 F.3d 1202, 1208 (5th Cir. 1994).

[8]The NFMA requires, *inter alia*, that the Forest Service publish plans designed to protect natural resources and ensure biodiversity when making decisions concerning the National Forests. See 16 U.S.C. § 1604(g). The Act also requires the Forest Service to engage in periodic inventorying and monitoring of the National Forests. See id.

9

protection in these Forests, <u>see id.</u> §§ 1604(g)(2)(B), (3)(C). Appellees also alleged that the Forest Service had violated its own regulations, <u>see</u> 36 C.F.R. pt. 219, and requested an injunction against future even-aged logging until those violations are rectified.

Although the Forest Service and the Timber Intervenors opposed any trial of these issues on the ground that judicial review of timber sales is limited to the administrative record compiled by the agency, and that no such record existed in this case, the court set the case for trial.[9] Following a continuance, the trial commenced on April 2, 1996, and lasted for seven days. Post-trial briefing was completed in June 1996. On August 14, 1997, the district court issued a memorandum opinion, order, and injunction, and a judgment on findings of fact and conclusions of law.

At the outset of its opinion, the court concluded that "[u]nder the [Administrative Procedure Act of 1946 ("APA"), 5 U.S.C. §§ 551, 701-706 (1994)], this court has jurisdiction to review the Forest Service's failure to act with respect to alleged on-the-ground violations of the NFMA and

---

[9]The district court found "that there are genuine issues of material fact with respect to whether the Forest Service has in practice implemented the regulations governing even-aged management of the national forests." Its order, issued August 22, 1995, identified three issues for trial:

(1) Whether the Forest Service has, in practice, as required by the regulations, kept current and adequate inventories and monitoring data for key resources in the national forests in Texas; (2) Whether the Forest Service has, in practice, as required by the regulations, protected key resources in its application of even-aged management techniques; and (3) Whether the Forest Service has, in practice, as required by the regulations, provided for the diversity of plant and animal communities in its application of even-aged management techniques.

<u>Sierra Club v. Glickman</u>, 974 F. Supp. 905, 912 (E.D. Tex. 1997). The court also denied the Forest Service's and Timber Intervenors' motion for summary judgment, holding that it "ha[d] the authority and jurisdiction to go beyond review of any record made by the Forest Service on these three issues and receive evidence on whether the Forest Service has in practice implemented its regulation" and that "[a] failure by the Forest Service to follow the [NFMA], its own regulations, and the [LRMP] must be said to be 'arbitrary and capricious' and therefore contrary to law."

10

regulations." See Sierra Club v. Glickman, 974 F. Supp. 905, 914 (E.D. Tex. 1997). The court

stated that

> The Forest Service's failure to implement timber sales in compliance with the NFMA and
> regulations, as alleged by Plaintiffs, is a final agency action for purposes of [APA] section
> 704. Once the Forest Service adopted a final, definite course of action or inaction with
> respect to the management of the forest lands (regardless of whether that action or inaction
> is memorialized in a written agency decision), the court has a "final agency action" to review.
> A contrary view, held by the Federal Defendants and Timber Intervenors, would put all of the
> Forest Service's on-the-ground violations of the NFMA and regulations beyond judicial
> review. Under this view, the Forest Service seeks absolute immunity from its on-the-ground
> management activities.

Id. at 914-915. The court also determined that the even-aged claims were not rendered moot by the

issuance of the 1996 revised LRMP, see id. at 915 n.7, and that the "arbitrary and capricious"

standard of review set out in APA § 10, 5 U.S.C. § 706, was the appropriate guideline and that the

NFMA and its attendant regulations provided the relevant "law to apply." Id. at 915-916.

Turning to the merits, the court determined that the Forest Service had violated and was

continuing to violate the NFMA concerning the protection of soil and watershed resources and

concerning inventorying and monitoring for wildlife and diversity. See id. at 911-12. In particular,

as noted above, the court held that the Forest Service had violated NFMA § 6(g), 16 U.S.C. §

1604(g), in several respects.[10] See id. at 926.

_____

[10]Specifically, the district court held that the Forest Service had violated § 6(g)(2)(B), 16 U.S.C.
§ 1604(g)(2)(B), which requires the formulation of regulations that "provide for obtaining inventory
data on various renewable resources, and soil and water;" § 6(g)(3)(C), 16 U.S.C. § 1604(g)(3)(C),
which requires regulations that "specify guidelines for land management plans developed to achieve
the goals of the Program . . . [by] insur[ing] research on and (based on continuous monitoring and
assessment in the field) evaluation of the effects of each management system to the end that it will
not produce substantial and permanent impairment of the productivity of the land;" § 6(g)(3)(E)(i),
(iii), 16 U.S.C. § 1604(g)(3)(E)(i), (iii), which requires that the guidelines "insure that timber will be
harvested from National Forest System lands only where – soil, slope, or other watershed conditions
will not be irreversibly damaged; . . . protection is provided for streams, streambanks, shorelines,
lakes, wetlands, and other bodies of water from detrimental changes in water temperatures, blockages

With respect to soil resources, the district court found that the Forest Service's even-aged timber management practices were causing substantial and permanent damage to the soil in the National Forests. See id. The court stated that

The Forest Service is neither protecting nor conserving the key resource of soil. Forest Service management practices, which have been primarily even-aged, are causing severe erosion of soil from the forest landscape and related loss of organic matter. This soil loss is substantially and permanently impairing the productivity of the forest land and possibly timber production.

Id.

Similarly, the court found that the Forest Service's even-aged management practices "have caused substantial and permanent . . . sediment deposit in streams and waterways," id. at 927, and that "[t]he Forest Service is neither protecting nor conserving the key resource of watershed," id. at 928. The court's conclusion was based on its finding that the agency's "on-the-ground" practice was to ignore the standards and guidelines established by the 1987 Plan for the protection of watercourses. See id. at 927.

Next, the court concluded that the Forest Service failed to carry out its inventorying and monitoring obligations concerning certain wildlife resources.[11] See id. at 931. The court noted that the Forest Service had acknowledged that, with certain exceptions, it does not monitor the

_____

of water courses, and deposits of sediment, where harvests are likely to seriously and adversely affect water conditions or fish habitat;" and § 6(g)(3)(F)(v), 16 U.S.C. § 1604(g)(3)(F)(v), which requires that the guidelines "insure that clearcutting, seed tree cutting, shelterwood cutting, and other cuts designed to regenerate an even-aged stand of timber will be used as a cutting method on National Forest System lands only where . . . such cuts are carried out in a manner consistent with the protection of soil, watershed, fish, wildlife, recreation, and esthetic resources, and the regeneration of the timber resource."

[11]The court found, however, that the Forest Service had not violated the NFMA with respect to ensuring diversity, protecting fish, wildlife, recreation, aesthetic, and timber resources, and inventorying and monitoring those resources. See id. at 942.

12

populations of the wildlife species which were selected in the 1987 Plan and the 1996 revised LRMP as Management Indicator Species because such monitoring and inventorying is "not practical." Id. at 932. Based on this concession, the court found that "[t]he Forest Service is not adequately inventorying or monitoring: (1) populations of some wildlife MIS; (2) diversity in terms of its prior and present condition; and (3) its management activities as to whether it is meeting objectives and adhering to management standards and guidelines." Id. at 933. Consequently, "[t]he Forest Service's failure to adequately inventory and monitor may be causing permanent and substantial damage to the productivity of the land." Id. at 912.

Because it found the Forest Service's actions to be arbitrary and capricious, the court then enjoined the Forest Service and the Timber Intervenors "from future timber harvesting until such time that the Forest Service (1) complies with the NFMA and regulations with respect to the implementation of past timber sales and (2) assures the court that any future timber harvests will be in compliance on-the-ground." Id. at 945. Harvesting could begin again after further order of the court or modification of the injunction. See id. Additionally, in a September 8, 1997, order, the court entered an "Order Granting Agreed Motion for Partial Temporary Stay of Injunction," allowing activities on fourteen active timber sales contracts to continue. This order also provided that the Forest Service "shall implement the Inventorying and Monitoring Guidelines" set forth by statute.

**III**

Before ruling on the propriety of the injunction, two additional issues confront us as we review the district court's thorough and well-reasoned opinion in the instant matter. First, although neither the Forest Service nor the court below addressed the issue, we must consider *sua sponte* whether the district court should have heard this case, that is, whether Appellees had standing to bring their claims

13

in federal court.[12]  See Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986).  Second, if we determine that they did have standing, we must review whether subject-matter jurisdiction existed allowing the district court to conduct a trial on the merits and, subsequently, to issue an injunction against the Forest Service.

## A

In Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 118 S. Ct. 1003 (1998), the Supreme Court recently reminded us that

> Article III, § 2 of the Constitution extends the "judicial Power" of the United States only to "Cases" and "Controversies."  We have always taken this to mean cases and controversies of the sort traditionally amenable to and resolved by the judicial process.  Such a meaning is fairly implied by the text, since otherwise the purported restriction upon the judicial power would scarcely be a restriction at all.  Every criminal investigation conducted by the Executive is a "case," and every policy issue resolved by congressional legislation involves a "controversy."  These are not, however, the sort of cases and controversies that Article III, § 2, refers to, since "the Constitution's central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts."  Standing to sue is part of the common understanding of what it takes to make a justiciable case.

523 U.S. at —, 118 S.Ct. at 1016 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-60 (1992) ("Lujan II")) (other citations omitted).

At an "irreducible constitutional minimum," a plaintiff must establish three elements to have standing.  Id. at —, 118 S. Ct. at 1016.  First, the plaintiff must show that it has suffered "an injury in fact–a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical."  Id. at —, 118 S.Ct. at 1016 (internal quotation omitted).  Second, the plaintiff must

---

[12] Although the dissent decries our review of Appellees' claims in the context of Article III's standing requirements, lamenting that "[t]his case is not about whether the Environmentalist Groups have Article III standing," post at 2, we note our responsibility to confirm standing, even where such a review ultimately leads us to conclude that the complainants did in fact have standing to bring their claims.

14

establish "causation–a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." Id. at —, 118 S. Ct. at 1016 (internal citation omitted). Lastly, "there must be redressability–a likelihood that the requested relief will redress the alleged injury." Id. at —, 118 S. Ct. at 1017 (internal citation omitted).

At its most rudimentary, Appellees' suit is an attempt to force the Forest Service to comply with the procedural requirements of the NFMA and its regulations. While we agree with our sister circuit that "the particular nature of a case does not–and cannot–eliminate any of the 'irreducible' elements of standing," Florida Audubon Soc'y v. Bentsen, 94 F.3d 658, 664 (D.C. Cir. 1996), the Supreme Court has counseled that, in a procedural rights case such as the one at bar, a plaintiff is not held to the normal standards for redressability and immediacy, see Lujan II, 504 U.S. at 573 n.7; see also Sierra Club v. Glickman, 156 F.3d 606, 613 (5th Cir. 1998) (interpreting Lujan II). Of course, a procedural rights plaintiff cannot gain standing merely because of the Government's alleged failure to comply with relevant procedural requirements. See Lujan II, 504 U.S. at 573. Instead, a plaintiff

> must show an injury that is both concrete and particular, as opposed to an undifferentiated interest in the proper application of the law. Likewise, the plaintiff must establish that the injury is fairly traceable to the proposed government action or inaction. Finally, although a procedural rights plaintiff is not held to the normal standards for redressability, in the sense that the plaintiff need not show that the procedural remedy that he is requesting will in fact redress his injury, the plaintiff must nonetheless show that there is a possibility that the procedural remedy will redress his injury. In order to make this showing, the plaintiff must show that "the procedures in question are designed to protect some threatened concrete interest of [its] that is the ultimate basis of [its] standing."

Sierra Club v. Glickman, 156 F.3d at 613 (quoting Lujan II, 504 U.S. at 573 n.8).

In this case, we are persuaded that Appellees made just such a showing and that, consequently, the district court had jurisdiction to hear their claims. As we will describe *infra*, Appellees' complaints were alleged with adequate specificity to meet the constitutional, statutory, and prudential

15

doctrines of standing that bind the federal courts. In reaching this conclusion, we examined the requirements of Lujan v. National Wildlife Federation, 497 U.S. 871 (1990) ("Lujan I") and its progeny (Lujan II and Steel Co.). Although these decisions substantially altered federal jurisprudence for plaintiffs seeking standing in procedural rights cases,[13] our recourse to those cases confirms, rather than undermines, our belief that Appellees' claims against the Forest Service were properly before the district court.

Consequently, we find the jurisdictional issue raised by the dissent to be a phantom one.[14] Our analysis under Lujan I and its progeny convinces us that Appellees were properly before the court.

---

[13]While we decline at this juncture to join the still-raging debate over just how much Lujan I changed standing requirements, compare Steel Co., 523 U.S. at —, 118 S. Ct. at 1017 n.5 ("Although we have packaged the requirements of constitutional 'case' or 'controversy' somewhat differently in the past 25 years–an era rich in three-part tests–the point has always been the same: whether a plaintiff 'personally would benefit in a tangible way from the court's intervention.'") (citation omitted) with Steel Co., 523 U.S. at —, 118 S. Ct. at 1027 (Stevens, J., concurring in the judgment) ("[Redressability] is a judicial creation of the past 25 years.") (collecting cases), it seems safe (and sage) to note that Lujan I likely eviscerated certain prior cases that afforded procedural rights plaintiffs standing where the three-part test was not met, see, e.g., United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 683-685 (1973) (laying out expansively the elements sufficient for review under § 702 of the APA).

[14]It is instructive, although not dispositive, to note that Appellants devote scarce attention to Appellees' standing. Appellants instead challenge at length the district court's decision to develop a record in this case. Additionally, the district court, in its exhaustive opinion, similarly does not question Appellees' right to bring the case before the court. In the post-Lujan I era in which requirements for standing are imposed in an especially constraining manner, if Appellees arguably lacked Article III standing, it would be reasonable to assume that the Government and the Timber Intervenors would have focused almost exclusively on this argument. That they do not, and instead challenge with great emphasis the district court's factfinding, suggests that a Lujan I analysis is not the answer here. Of course, this observation in no way contradicts our obligation to examine standing; it is merely curious that none of these sophisticated parties even raised the issue.

We also note with interest that the Eleventh Circuit, in a recent case involving the same issue and the same parties, did not even pause to address the standing issue, principally because there is no issue. See Sierra Club v. Martin, 168 F.3d 1 (11th Cir. 1999). We analyze the Martin decision *infra*, Section III.B.3.

16

The dissent's hallowed view of Lujan I would eliminate all but the narrowest types of procedural rights suits, but we remain of the view that Lujan I is primarily a case involving the ripeness of claims. In Lujan I, a national wildlife group challenged the entire "land withdrawal review program" of the Bureau of Land Management ("BLM"). See Lujan I, 497 U.S. at 879-81. This program determined the status of public land and its availability for private uses such as mining. See id. at 879. The plaintiffs claimed a right to challenge the BLM's decisions under § 10(a) of the APA, 5 U.S.C. § 702, which provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." Id. at 882. The Supreme Court determined that the plaintiffs did not satisfy § 702's requirements for judicial review because they failed to identify an "agency action" within the meaning of § 702. See id. at 892-93. The court held that neither the allegations of the complaint nor the supporting affidavits "enable the respondents to challenge the entirety of the so-called 'land withdrawal review program.'" Id. at 890. The Supreme Court, then, denied standing because the plaintiffs failed to meet the statutory requirement that they be adversely affected or aggrieved by an agency action. See id.

Because the Lujan I plaintiffs challenged generic agency action and offered no proof that they had yet been harmed by any specific action, the Supreme Court's determination essentially concerns the ripeness of claims. See id. at 890-91. In Lujan I, no case or controversy existed because the plaintiffs had not alleged justiciable injury; in the matter at bar, however, Appellees alleged particularized injury and supported their allegations with voluminous evidence of individualized harm. Additionally, Appellees pointed to *specific violations* of *specific laws* in challenging the timber sales that had resulted from even-aged timber management by the Forest Service. To suggest that Appellees'

17

challenge in this case is a generic one and tantamount to the challenge in Lujan I is to equate apples

and oranges; Appellees' challenge here demonstrates that environmental plaintiffs have learned to

work within Lujan I's rubric by particularizing the injuries that they allege.[15]  The justiciability of the

injuries alleged in the two complaints (and the evidence presented to support the claims) are miles

apart legally and persuasively.  We note at least three ways in which the two claims are conceptually

distinct.

**1**

First, as indicated above, the ripeness of Appellees' claims is not truly an issue in this case.[16]

---

[15] The dissent chides us for "conflat[ing] the standing requirements of Article III with Lujan I's discussion of the APA's 'final agency action' requirement."  Post at 5.  We read Lujan to require particularized injury *suffered in the context of* final agency action such that our analysis encompasses both issues.  Just as a complaining party must demonstrate an injury to prove standing, see Lujan I, 497 U.S. at 882-90, so too must the party establish subject matter jurisdiction by pointing to a final agency action by which its injury was sustained, see American Airlines, Inc. v. Herman, 176 F.3d 283, 287 (5th Cir. 1999).  We find that the Appellees have fulfilled both requirements in this case.

[16] Although the dissent accords talismanic significance to Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 118 S. Ct. 1665 (1998), that case is both easily distinguished and supportive of allowing standing in this case.  In Ohio Forestry, a unanimous Supreme Court held that the Sierra Club's challenge to an LRMP adopted by the Forest Service was not yet ripe for review.  See 523 U.S. at —, 118 S. Ct. at 1668.  The Sierra Club argued that the plan permits too much logging and clearcutting in an Ohio National Forest, see id. at —, 118 S. Ct. at 1668, but the Court reasoned that, while the LRMP sets logging goals, selects the areas of the forest that are suited to timber production, and determines "probable methods of timber harvest," it "does not itself authorize the cutting of any trees," id. at —, 118 S. Ct. at 1668.  Before the Forest Service could cut trees, it must follow the NFMA and its attendant regulations to insure that the logging is lawful.  See id. at —, 118 S. Ct. at 1668.
These are crucial differences from the case at bar.  Here, the Forest Service *has* authorized logging pursuant to an LRMP and has approved sales of the timber logged.  It is axiomatic that, while Ohio Forestry stands for the proposition that "abstract disagreements over administrative policies" will not make a controversy ripe, id. at —, 118 S. Ct. at 1672 (citation omitted), disagreements over final, specific agency action are necessarily ripe.  Furthermore, Appellees in the instant case allege that the Forest Service has not abided by the NFMA and its regulations in the actual decisions to use even-aged management and not to inventory and to monitor; the Forest
Service had not even reached the point of implementing the statute on-the-ground at the time the

18

Although the Forest Service argues briefly that the claims in this case are not ripe because future timber sales have not occurred, this argument is unavailing and skirts the true question. This case involves a decision by the Forest Service to permit even-aged timber management—and future timber sales—on specific plots of National Forest land. Naturally, there may be no future sales until the trees have been logged, but it is the logging practices and the failure to inventory and to monitor that Appellees challenge here: specific practices, on specific pieces of land.[17] The practices at issue in Lujan I were entirely dissimilar; in that case, the plaintiffs challenged everything about the BLM's policies from soup to nuts, not a site-specific individual policy.

In Lujan I, the Supreme Court focused on the allegations of the complaint and turned to accompanying affidavits to search for saving support. At no time did the Court state that well-pleaded allegations in a complaint, if they appropriately identified an "agency action," would not be sufficient to confer standing. See id. at 890-98. The failure of the Lujan I plaintiffs—evident in both the complaints and affidavits—was that they sought "wholesale improvement of the [BLM's] program by court decree, rather than in the offices of the Department [of the Interior] or the halls of Congress, where programmatic improvements are normally made." Id. at 891. In the case at bar, Appellees did far more than challenge an amorphous program of the Forest Service;[18] instead, they pointed to specific activities on specific plots in specific National Forests and challenged the mechanism by which the Forest Service determined how to approve those discrete logging practices.

---

Ohio Forestry suit was brought.

[17]We further address *infra*, at Section III.B.2, the question whether the agency's action is final for purposes of review.

[18] Indeed, in Lujan I, the "land withdrawal review program" did not even exist; it was merely an arbitrary designation given to several BLM activities.

19

In Lujan I, the Court opined that

> It may well be, then, that even those [rules of general applicability adopted by the Bureau] will not be ripe for challenge until some further agency action or inaction more immediately harming the plaintiff occurs. But it is at least entirely certain that the flaws in the entire 'program' . . . cannot be laid before the courts for wholesale correction under the APA.

Id. at 892-93.

Later in his opinion in Lujan I, Justice Scalia observed that, while that case was inappropriate for review and judicial intervention, some future case would be ripe for intervention where

> a specific "final agency action" has an actual or immediately threatened effect. Such an intervention may ultimately have the effect of requiring a regulation, a series of regulations, or even a whole "program" to be revised by the agency in order to avoid the unlawful result that the court discerns.

Id. at 894 (citation omitted). Such is the case here.

**2**

Second, Appellees do not challenge rules of general applicability, but specific applications of those rules; these applications are the "further agency action" that Lujan I contemplated for agency action to ripen. The plaintiffs in Lujan I were denied standing because they could not point to a specific final agency action by which they had been aggrieved. Instead, those individuals sought to challenge virtually all of the BLM's activities at the same time. Indeed, when alleging injury, they could only point to their having been prejudiced in their desire to make use of public lands "in the vicinity" of those governed by the BLM. Id. at 886, 887. In other words, they failed the APA's test for judicial review on two statutory levels: they could not show which agency action had aggrieved or injured them and, as a result, they could not point to a "final agency action" which they contested.[19]

_____

[19]To state that "only one issue"—the district court's jurisdiction to hear this case—governs this appeal, as the dissent does, post at 3, conflates the district court's decision to review the agency's actions in the absence of a record with the propriety of Appellees' claims. We believe, however, that

The Forest Service admits that an agency decision to conduct a timber sale is subject to judicial review but urges that those decisions may be reviewed only when they actually occur. In this case, the Forest Service argues, the action is not final because the timber sales have yet to take place or even be announced. This argument, while compelling on its face, misses the point that the action which the environmental protection organizations contest is the failure to follow the NFMA regulations; the <u>remedy</u> is the prohibition on future timber sales stemming from even-aged timber management. Of course, the action of failing to comply with the NFMA has occurred. The Forest Service implicitly recognizes that its failure to act is "final agency action," but it seeks to dismiss this problematic information by arguing that the environmental protection organizations were not contesting these failures in the original complaint.

Additionally, the even-aged management practices at issue here were specific actions in which the agency engaged, on specific plots of land, and with specific trees in mind. In order for <u>Lujan I</u> to be apposite, the environmental protection organizations would have had to challenge the totality of the Forest Service's timber cutting operations, something they did not do. Appellees in the instant case do not demonstrate either of the <u>Lujan I</u> plaintiffs' deficiencies in this regard. They insist that they are aggrieved by specific actions on specific land (rather than the wide-ranging complaints in <u>Lujan I</u>) and they point to two final agency actions—the decision to engage in timber sales resulting from even-aged management and the failure to inventory and to monitor MIS—as the sources of their injuries.[20]

---

whether the district court can develop a record in this case *is not the same question as* whether the Appellees have standing to bring these claims or whether they identified final agency actions on which those claims are predicated.

[20]<u>See</u> *infra* Section III.B.2 for a fuller discussion of final agency action.

**3**

Third, Lujan I was a case involving summary judgment. Read with a liberal construction, it stands for the proposition that, in order to survive a motion for summary judgment, plaintiffs must do more than allege injury; they must produce affidavits or other evidence showing the essential kind of injury necessary for recovery under the APA. Indeed, a narrower, yet still plausible reading of Lujan I is that it stands only for the proposition that allegations in a complaint must be sufficient to confer standing on their face.

In the case at bar, Appellees' allegations were well-pleaded. They identified specific areas of concern and survived summary judgment; their allegations did not relate to general usage and unfounded criticisms of the Forest Service (as the allegations by the Lujan I plaintiffs did). Consequently, Appellees fall out of the Lujan I paradigm under this rationale as well. Their claims were settled through the mechanism of a factfinding trial and the issuance of an injunction; the dissent's effort to analogize this resolution to that denied by Lujan I mistakenly conflates the distinction between allegations necessary to support a motion for summary judgment and the decision by a district court to enter a preliminary injunction.

**B**

Having determined that Appellees had standing to bring their case, we turn now to the issue of the district court's action in conducting a trial and issuing an injunction. We review a district court's decision to issue an injunction for abuse of discretion, meaning that the factual underpinnings of the decision are reviewed for clear error, while the application of legal principles is reviewed *de novo*.[21]

---

[21]The dissent implies that we should review the district court's opinion *de novo*, but we decline to follow the faulty logic that would require us to do so. Even Lujan I, the dissent's golden child, does not anywhere prescribe or even suggest that the actual question presented to us is one of subject

See Alcatel USA, Inc. v. DGI Techs., Inc., 166 F.3d 772, 790 (5th Cir. 1999); see also Hoover v.

Morales, 164 F.3d 221, 224 (5th Cir. 1998) (observing that a preliminary injunction is an extraordinary

remedy that will be overturned only where a district court has abused its discretion).  Therefore, while

we will consider *de novo* the district court's application of the APA, if we find that the APA allowed

the district court to assume that role, we can invalidate the injunction only if we discover clear error

during the fact-gathering process.

**1**

In its essence, this case is about exhaustion of administrative remedies.  Appellants—the Forest

Service and the Timber Intervenors—argue that the district court erred in ordering what they style

a "*de novo*" trial in this case because the court did not have the authority to maintain an extra-record

proceeding regarding past compliance with the NFMA.  In support of their position, the Timber

Intervenors stress Lujan I for the proposition that the "even-aged timber management practices"

enjoined by the district court were not "agency action" as contemplated by the APA, 5 U.S.C. § 702.

In the absence of an "agency action," Appellants argue, there was nothing for the district court to

review; hence, it abused its discretion in ordering and conducting a trial.  Appellants further contend

that the NFMA is a planning statute devoid of substantive requirements, and that the Forest Service

could not "violate" it in any event by engaging in even-aged timber management practices because

the statute only stipulates a process that must be followed and not results that must be achieved.

matter jurisdiction demanding *de novo* review.  The jurisdictional "analysis" contemplated by the dissent is inapposite because, even if Appellees lack standing, the ability of the district court to play a role in this litigation is not truly at issue in this case; put another way, the question is not whether the district court should have dismissed this case for want of jurisdiction.  Instead the parties dispute whether the district court's entry of an injunction against the Forest Service's even-aged timber management practices was proper.  The correct standard of review, then, is that which we would apply to the entry of any injunction in any case: abuse of discretion.

23

Appellees, on the other hand, argue that the NFMA contains substantive requirements, enforceable by a court, and that the trial was necessary to measure the Forest Service's compliance with those requirements. The Wilderness Society Appellees dispute that the trial was a *de novo* review, and instead characterize it as fact-gathering on the part of the court in the absence of a record compiled by the Forest Service.

We do not believe that the district court abused its discretion, and we turn again to Lujan I for instruction in this matter. In Lujan I, the Court enjoyed the benefit of a complete, intensive administrative record that it could review thoroughly before it made its standing determination. In the case at bar, no record existed supporting the Forest Service's actions; indeed, the Forest Service had refused, despite earlier admonitions by this court, to follow the requirements of various statutes and numerous regulations that it had itself enacted and to develop an administrative record of its actions. Although the dissent urges that Appellees "have not argued that the Forest Service has not *attempted* to comply with the NFMA and its regulations," post at 8, such an argument would have been surfeit since Appellants' response to the district court's orders was to concede that it had not followed the law and to complain that such requirements were "not practical." Sierra Club v. Glickman, 974 F. Supp. at 932. Unlike Lujan I, then, in which the Court could look to the administrative record developed by the agency, the district court in this case had no such luxury. [22] Consequently, it determined to develop that record through judicial factfinding. This decision was proper and within the district court's discretion.[23]

---

[22]See *infra* note 27 & accompanying text.

[23]Appellees in the case at bar could have had neither their claims nor their standing considered in an equally-intense light absent the district court's action *because there was no administrative record in this case*. In other words, to attack the plaintiffs' standing, as the dissent impliedly does, is based

24

The NFMA lacks a judicial review component, so the judicial review provisions of the APA apply by default. See, e.g., Wilderness Soc'y v. Alcock, 83 F.3d 386, 388 n.5 (11th Cir. 1996) ("Since the NFMA does not provide for judicial review of agency actions taken pursuant to the Act, we have jurisdiction over a challenge under the NFMA only if the agency action is final."); Sierra Club v. Marita, 46 F.3d 606, 610 n.3 (7th Cir. 1995) ("NFMA [does not] . . . explicitly provide for judicial review of Forest Service decisions. The Sierra Club therefore brought suit under the APA, which stipulates that 'a person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.'") (citation omitted). As such, in order to determine whether the district court had the authority to conduct a trial on this subject, we must first look at the structure of the APA to determine the sort of activity in which the Forest Service was engaged that led to the present dispute.[24]

The APA identifies only three types of agency proceedings: rulemaking, see 5 U.S.C. § 551(5), adjudication, see id. § 551(7), and licensing, see id. § 551(9). Under the APA, an "order" is a "final

---

on a reading of the factual, administrative record developed by the district court in this case. The irony is especially staggering considering that the dissent would have us reverse the district court, forcing it to make the baseline standing determination without benefit of any record, thereby prohibiting it from deciding if the Forest Service had indeed aggrieved the plaintiffs through a final agency action.

[24]Even recourse to the APA is inappropriate, however, where a plaintiff seeks pre-implementation judicial review of a forest plan, since Congress has not provided for such review. See Ohio Forestry, 523 U.S. at —, 118 S. Ct. at 1672. Other statutes, primarily those contemplating agency "enforcement" as opposed to agency "planning and management," allow such review. See id. at —, 118 S. Ct. at 1672 (noting that the Toxic Substances Control Act, the Surface Mining Control and Reclamation Act, the Resource Conservation and Recovery Act, the Clean Air Act, and the Outer Continental Shelf Lands Act provide for pre-implementation review).

disposition . . . of an agency in a matter other than rulemaking." Id. § 551(6). In other words, except

for rulemaking, an agency's final disposition is necessarily an order. Because the APA further defines

"adjudication" as the process for formulating an "order," any agency process that results in a final

disposition, except for rulemaking, is necessarily adjudication.[25]

These semantic steps are necessary to determine what sort of action the Forest Service undertook

with respect to the even-aged timber management in the Texas National Forests. Since the injunction

bars even-aged management in the Texas National Forests, it is safe to assume that the Forest Service

has, pursuant to the 1987 Plan, approved even-aged harvesting techniques in the Texas National

Forests and subsequent sales of timber from those harvests. Notwithstanding both sides' vehement

assertions that these actions were not adjudicatory in nature, the approvals did constitute

adjudications on the part of the Forest Service.[26]

---

[25]The one exception to this broad view of agency practices are the investigation and information gathering aspects of an agency's functioning. An agency's investigation and information gathering might be entirely incidental to rulemaking or adjudication, which is to say that investigation and information gathering might be tools to help an agency determine, *inter alia*, whether to make a rule or to issue an order.

[26]The dissent takes issue with our classification of this agency action, arguing that an adjudication "implies a hearing . . . after notice, of legal evidence on the factual issues involved" in a dispute. Post at 7 n.4. Of course, in the context of administrative law, "adjudication" refers not only to the formal trials referenced by the dissent but also to informal adjudications in which the rights of parties are determined. The Supreme Court noted this duality in Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633 (1990). In that case, the Court noted that "formal adjudication" is
contemplated by APA §§ 5, 7-8, 5 U.S.C. §§ 554, 556-57, which sections require "that parties be given notice of 'the matters of fact and law asserted,' § 554(b)(3), an opportunity for 'the submission and consideration of facts [and] arguments,' § 554(c)(1), and an opportunity to submit 'proposed findings and conclusions' or 'exceptions,' § 557(c)(1), (2)." Id. at 655. An "informal adjudication," described in APA § 6, 5 U.S.C. § 555, contains only "minimal requirements," not the full indicia of a procedural undertaking associated with a formal adjudication. Id. While the Supreme Court expressed a preference for formal adjudication in the early years of the APA, see Wong Yang Sung v. McGrath, 339 U.S. 33, 40 (1950), "[w]ith the passage of time, however, the notion that one should, when in doubt, invoke the APA's procedures has waned," WILLIAM F. FUNK, ET AL.,

26

Just as the decision (before and after this court's ruling in <u>Sierra Club I</u>) to authorize even-aged management techniques was a type of adjudication, so, too, was the Forest Service's decision not to follow its own regulations with respect to protecting key resources and inventorying and monitoring its resources in the Texas National Forests.[27] Significantly, the action—failing to implement timber sales in compliance with the NFMA—was a final agency action because it terminated the inter-agency decisionmaking process.[28] <u>See</u> <u>Sierra Club v. Glickman</u>, 974 F. Supp. at 914. As with any other type of adjudication, a disappointed party may sue for judicial review of an agency's final decision. Section 706 of the APA specifies the grounds for judicial review of any agency action, and Section 706(2)(F) provides for courts to determine facts independently by authorizing courts to overturn agency decisions if they are "unwarranted by the facts to the extent that the facts are subject to trial *de novo* by the reviewing court." 5 U.S.C. § 706(2)(F). While the early years of the APA witnessed many such trials where a full administrative hearing had not taken place, the Supreme Court's

---

ADMINISTRATIVE PROCEDURE AND PRACTICE 187 (1997). In other words, informal adjudication is by far more prevalent today. For our purposes, it is sufficient to note that an informal adjudication may be something as simple as the Forest Service's reviewing a request for a special use permit, <u>see</u> <u>Everett v. United States</u>, 158 F.3d 1364, 1368 (D.C. Cir. 1998), or an agency's decision to release documents pursuant to the Freedom of Information Act, <u>see</u> <u>Daisy Mfg. Co. v. Consumer Prods. Safety Comm'n</u>, 133 F.3d 1081, 1083 (D.C. Cir. 1998). Similarly, the Forest Service's several decisions in this case constituted informal adjudications.

Regardless, this distinction probably makes little difference in the long run, since all parties also agree that the arbitrary and capricious standard of review was appropriate to apply in this case.

[27]While this reasoning may seem logically stilted, by process of elimination the decision not to follow the regulations was clearly not a rulemaking, so must therefore be an adjudication. In addition, electing not to comply with regulations is in effect a "passive order," and an "order," as established above, constitutes an adjudication.

[28]Necessarily entwined with this conclusion is the district court's decision to conduct a factfinding to determine the extent of the Forest Service's noncompliance. Since the Forest Service had not seen fit to develop an administrative record offering explanations for its course to this final action, the district court was within its discretion to develop the record itself.

decision in <u>Citizens to Preserve Overton Park v. Volpe</u>, 401 U.S. 402 (1971), <u>overruled on other ground by</u> <u>Califano v. Sanders</u>, 430 U.S. 99, 105 (1977), drastically changed this practice.

<u>Overton Park</u> eliminated *de novo* review in all cases except those in which "the action is adjudicatory in nature and the agency factfinding procedures are inadequate" and "when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action."[29] 401 U.S. at 415. As a result of <u>Overton Park</u>, however, *de novo* review of agency adjudications has virtually ceased to exist. In its stead, the "arbitrary and capricious" standard of review of 5 U.S.C. § 706(2)(A) is now applied to review of agency determinations in the adjudicatory setting. Interestingly, both sides to the instant dispute agree that this was the appropriate standard of review for the district court; Appellees contend that the court simply found the Forest Service's actions to be arbitrary and capricious, while Appellants believe, however, that the district court instead engaged in the disfavored *de novo* review.

Although <u>Overton Park</u> truncated the use of *de novo* review, it vastly expanded the range of arbitrary and capricious review under § 706(2)(A). Prior to <u>Overton Park</u>, no record or decision needed to be presented in order for a court to justify an agency's action; arbitrary and capricious review was essentially a carte blanche for agency action. <u>See, e.g.</u>, <u>Pacific States Box & Basket Co. v. White</u>, 296 U.S. 176, 182 (1935) (finding no arbitrary and capricious action and intimating that such a finding should be the norm when reviewing agency action). <u>Overton Park</u> added teeth to arbitrary and capricious review: when applying arbitrary and capricious review to an agency decision, a court must "engage in a substantial inquiry . . . a probing in-depth review . . . ." 401 U.S. at 415.

---

[29]In <u>Overton Park</u> itself, the Secretary of Transportation's decision to build an interstate through a city park was entitled to deference by the reviewing court, even though the Court implied that the agency's factfinding procedures were, in fact, inadequate.

The Court further observed that to "find arbitrariness, the court must consider whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment." Id. at 416. While "[t]he court is not empowered to substitute its judgment for that of the agency," it must engage in a "searching and careful" inquiry into the facts. Id. The district court did not conduct *de novo* review; in its opinion, the district court does not tell the agency what it "should have done" or substitute its judgment for that of the Forest Service. Rather, the purpose of the trial was to determine what the agency had done and why it had done it, both of which are acceptable under Overton Park and the APA.

Regardless of which standard of review the district court implemented—the typical "arbitrary and capricious" or the disfavored *de novo*—it is beyond peradventure that the district court developed a record in this case, and the absence of a pre-existing record is typically fatal to the court's ability to review a matter. In the absence of a record, that is, in an informal adjudication such as the ones that are the subject of the instant case, the court may either take testimony from "the administrative officials who participated in the decision," id. at 420, or remand the case to give the agency a chance to prepare an explanation, rather than give testimony in open court, see id. The Court in Overton Park considered these two options and, while leaving the possibility of a trial open, expressed a preference for the remand, see id., and subsequent decisions of the Supreme Court have clearly favored remand, see, e.g., Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990) (noting that remand to the agency is the "preferred course"); but see Harris v. United States, 19 F.3d 1090, 1096 n.7 (5th Cir. 1994) (noting that, while extra-record investigations to determine the correctness or wisdom of agency decisions are not allowed, having explanations from agency officials is acceptable).

29

In the instant case, the district court opted to conduct a trial to review the agency's informal adjudication with respect to its NFMA regulations rather than to remand the matter for further explanation. While many courts might have elected to remand the case to the agency for an explanation of its actions, the district court's decision to take testimony in the form of a trial was not an abuse of its discretion under current law and reflected exasperation with the Forest Service's repeated refusal to develop such a record despite ten years' worth of legal wrangling over this very issue and repeated requests that the Forest Service comply with its statutory duties.

At the conclusion of the trial, the court found the agency's action to be arbitrary and capricious, and, given the court's development of an administrative record—it caused 22 boxes of documents and exhibits to be produced—we cannot gainsay the district court's careful review of the facts and issues. Additionally, the memorandum opinion reflects a complete fleshing out this dispute. While we agree with Appellees that the district court simply developed a record by which to engage in arbitrary and capricious review, we will, for the sake of thoroughness, explore the alternative, and more complicated, argument that the district court actually engaged in a rare *de novo* trial typically eschewed under Overton Park's rubric.

**2**

Appellants' strongest argument is that the district court engaged in disfavored *de novo* review of agency action when it conducted a factfinding trial for the purpose of creating a record where none existed previously. In its opening brief, the Forest Service cites Florida Power & Light Co. v. Lorion, 470 U.S. 729 (1985), for the proposition that the general course of conduct when a court is reviewing agency action is to make reference to "the administrative record already in existence, not some new record made initially in the reviewing court." Id. at 743 (citation omitted). The Lorion Court further

30

held that "except in rare circumstances," a court is not to conduct a *de novo* inquiry into an agency's action but is instead to remand the matter to the agency for further explanation. Id. at 744. The Court offers no further guidance on what those "rare circumstances" might entail.

This procedure, the so-called "Record Rule," generally delineates the scope of the evidence upon which the merits of an administrative appeal will be resolved. A recent decision by the Second Circuit, however, in a case strikingly similar to the one at bar, supports the view that the Record Rule is not to be followed in all cases and that it should not be followed in this one. In National Audubon Soc'y v. Hoffman, 132 F.3d 7 (2nd Cir. 1997), the court held that

> [d]espite the general "record rule," an extra-record investigation by the reviewing court may be appropriate when there has been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decisionmakers or where the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency's choice.

Id. at 14. The district court in the case before us was faced with an identical scenario: the Forest Service had made no findings with respect to its obligations under the statutes and regulations, despite repeated requests, and the district court was forced to do so itself.

National Audubon Society goes even farther. The court observed that "[d]eviation from this 'record rule' occurs with more frequency in the review of agency [National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321-4347 (1995)] decisions than in the review of other agency decisions." Id.; see generally Susanne T. French, Comment, Judicial Review of the Administrative Record in NEPA Litigation, 81 CAL. L. REV. 929 (1993). The reason for this deviation is significant:

> This occurs because NEPA imposes a duty on federal agencies to compile a comprehensive analysis of the potential environmental impacts of its proposed action, and review of whether the agency's analysis has satisfied this duty often requires a court to look at evidence outside the administrative record. To limit the judicial inquiry regarding the completeness of the agency record to that record would, in some circumstances, make judicial review meaningless

31

and eviscerate the very purposes of NEPA. The omission of technical scientific information is often not obvious from the record itself, and a court may therefore need a plaintiff's aid in calling such omissions to its attention. Thus, we have held that the consideration of extra-record evidence may be appropriate in the NEPA context to enable a reviewing court to determine that the information available to the decisionmaker included a complete discussion of environmental effects and alternatives.

National Audubon Society, 132 F.3d at 14-15 (citing County of Suffolk v. Secretary of Interior, 562 F.2d 1368, 1384 (2nd Cir. 1977)); see also National Aubudon Soc'y v. Forest Service, 46 F.3d 1437, 1447-48 (9th Cir. 1993) (applying this exception).

Significantly, this court has previously held that a district court may review evidence in addition to the administrative record to determine whether an agency adequately considered the environmental impact under NEPA of a particular project. See Sabine River Auth. v. Dept' of Interior, 951 F.2d 669, 678 (5th Cir. 1992). We believe that an extension of this rule to the NFMA is both proper and prudent. That act also imposes a duty on the agency to follow certain complex scientific practices and to report on them. Appellants in the case before us, in an attempt to distinguish the statutes, argue that the NFMA is only procedural, not substantive, despite the fact that our decision in Sierra Club I suggested to the contrary. See 38 F.3d at 800-02. Since we hereby eliminate any confusion by concluding that the NFMA is a substantive statute imposing requirements on the Forest Service, see *infra* Part IV.A., it is but a small step to follow our analysis in Sabine River and to determine that the district court did not err in its decision to engage in a factfinding trial.[30]

---

[30]Notably, the dissent's poignant reliance on Cronin v. Dep't of Agric., 919 F.2d 439 (7th Cir. 1990), while bolstering its claim that the district court's actions in this case were imprudent, is not entirely supportive of that position. Even the Cronin court acknowledged that the admission of evidence outside the administrative record should be allowed in order to challenge an environmental assessment where there is no record and no feasible method of compiling a record in time to protect the objector's rights. See id. at 444. Such, of course, is the case before this court. There is no record concerning the actions of the Forest Service that Appellees could have challenged.

The application of <u>Sabine River</u> is especially appropriate since the agency's action was final; the decisionmaking process of the agency has been consummated and rights or obligations have been determined or legal consequences established. <u>See</u> <u>Bennett v. Spear</u>, 520 U.S. 154, 177-178 (1997). The decision neither to engage on-the-ground in soil and watershed protection nor to inventory and to monitor biodiversity as the NFMA prescribes were consummated by the agency. Furthermore, the rights of the Timber Intervenors on the one hand and the environmental protection organizations on the other were each determined when the Forest Service failed to engage in on-the-ground implementation of the NFMA.

The Forest Service determined that it would conduct timber sales from trees growing in Texas's National Forests; it considered two alternative means of harvesting the trees—even-aged and uneven-aged timber management; it was aware of the regulations that required it to inventory and to monitor species that would be affected by even-aged timber management practices; it affirmatively decided not to follow those regulations; it engaged in even-aged management; it conducted timber sales subsequent to those practices. When the Forest Service elected not to follow those regulations, it undertook a final agency action *for the purposes of the inventorying and monitoring that the regulations prescribed*. Failure to follow those regulations is what the Appellees challenged. The district court recognized this fact, and, when confronted with the Forest Service's complete lack of record evidence explaining why it failed to follow the regulations, gave the Forest Service the opportunity to develop a record supporting its decision not to follow the regulations.[31]

---

[31]Although the dissent agrees that "under certain circumstances, agency inaction may be sufficiently final to make judicial review appropriate," post at 7, it quickly strays from this reasoning with an inapposite quotation from another court. <u>See</u> <u>Public Citizen v. Nuclear Regulatory Comm'n</u>, 845 F.2d 1105, 1108 (D.C. Cir. 1988) (opining that "[p]etitioners just do not like what the Commission did"). We do not have before us a case of plaintiffs "dress[ing] up" an agency's action

33

Consequently, even if the district court did not engage in arbitrary and capricious review and instead conducted *de novo* review, we find this occasion to be a "rare circumstance" endorsed by Lorion because no record whatsoever existed. Since the administrative record was entirely inadequate and prevented the reviewing court from effectively determining whether the agency considered all environmental consequences of this action, the district court's decision to conduct plenary review and to consider additional information obtained from the parties through testimony was entirely appropriate. See National Audubon Society, 132 F.3d at 15; Sierra Club v. United States Army Corp of Engineers, 772 F.2d 1043, 1051-52 (2nd Cir. 1985). This action was appropriate additionally because Appellees' challenge represented a specific challenge to a final agency action.

Further support for our finding a "rare circumstance" in this case is that, if we were to adopt the dissent's position, there would never be an opportunity to challenge a timber sale resulting from even-aged timber management. Challenging multiple sales at once does not meet the dissent's stringent

---

as a failure to act, id.; the Forest Service indisputably declined to consider the NFMA regulations when it made its decision. We know this to be the case because there was no administrative record indicating any discussion or determination of how the Service could comply with the regulations.

In the alternative, we note that, even if Appellees *have* "dressed up" the Forest Service's failure to act, *i.e.*, even if the decision not to follow the regulations is best characterized as action rather than inaction, then the Service *has undertaken a final action* because there was no opportunity later to implement the regulations. The dissent's argument would thus fail under this construction of the language as well.

Finally, the dissent's implied analogy of the Sierra Club to complainants in other cases who "do not like" what a particular agency did in a particular situation, is one without much force. Of course the Sierra Club does not "like" what the Forest Service did; that does not mean that their challenge to the Service's decision not to follow the NFMA is without merit. While a party cannot challenge a "'final disposition' already made," Chemical Weapons Working Group, Inc. v. United States Dep't of the Army, 111 F.3d 1485, 1494 (10th Cir. 1997), where the process for making that decision complied with relevant regulations and APA processes, it may certainly challenge the implementation of a decision where that decision, that final agency action, is arbitrary and capricious.

34

requirement for a contesting "particular" actions.[32]  Post at 5.  Sales already undertaken, while certainly representative of "final agency action," could not be challenged because such an undertaking would be foreclosed as moot.  Post at 5 n.2 (citing Florida Wildlife Fed'n v. Goldschmidt, 611 F.2d 547, 549 (5th Cir. 1980) for the proposition that an action is moot where a federal appellate court "cannot undo what has already been done").  Prohibiting any challenge to an agency's action was not the point or the thrust of Lujan I, yet it would appear to be the only solution that would please the dissent.

The dissent impliedly concedes as much in its discussion of the Sierra Club's failure to challenge the Forest Service's LRMP or individualized timber sales.  Had Appellees only taken this route, the dissent implies, then they would have had standing under the APA.  Yet the dissent's own rationale of the Lujan I standing doctrine undercuts this hypothesis: had Appellees challenged the LRMP, such an action would have no doubt been too generic (and not a final agency action); had they challenged the individualized timber sales, such an action would no doubt have been moot because it had already occurred.  The dissent's lengthy discussion of Appellees' failure to identify a "final agency action" tends to camouflage the real issue in this case—the Forest Service took final action when it authorized timber sales stemming from even-aged management in direct contravention of the statutes and regulations that govern Forest Service action.

**3**

Our analysis in this case is persuasively supported by a recent opinion of a sister circuit.  In Sierra

---

[32]The dissent denies that its position possesses such polarity, post at 8, but its solution to this purported conundrum appears on its face to be exactly what Appellees did in this case: they "file[d] an action challenging the Forest Service's decision to proceed with . . . sale[s]," post at 8, approved as a result of the Forest Service's refusal to follow the NFMA and its attendant regulations.

Club v. Martin, 168 F.3d 1 (11ᵗʰ Cir. 1999), the Eleventh Circuit ruled on this exact issue. See 168 F.3d at 3-7. In Martin, the Forest Service argued that its decision to sell the timber rights to seven tracts of land within a Georgia National Forest was one committed to agency discretion. The sale would have allowed logging in the form of clearcutting, road building, and other related activities. See id. at 2. Over 155 tons of sediment would have been discharged into the Forest's rivers and streams as a result of these undertakings. See id. In theory complying with the NFMA, the Forest Service developed an LRMP and conducted a study of the projected impact of the sales, concluding that no adverse results would obtain. See id. at 2-3. The Sierra Club and other environmental groups argued, however, that the decision to proceed was arbitrary and capricious because the Forest Service had failed to inventory or to monitor endangered species of flora and fauna as required by the LRMP and the Forest Service's own regulations. See id. at 3. The district court held that the Forest Service was not required to obtain any population data before proceeding with the sales because the regulations at issue deal only with the formulation of LRMPs and not site-specific actions initiated under an LRMP.

The Eleventh Circuit reversed. In her opinion for the court, Judge Barkett ruled that (1) the NFMA and its attendant regulations do require actual on-the-ground population data for inventorying and monitoring of species and that the Forest Service's failure to comply with those regulations was arbitrary and capricious. See id. at 5-6. In the case at bar, we are faced with an identical situation and, for the reasons explained *supra*, agree with the Eleventh Circuit that the NFMA requires on-the-ground inventorying and monitoring and is not simply a planning statute. The Martin court also held that the Sierra Club could challenge the Forest Service's compliance with a Forest Plan as part of its challenge to site-specific timber sales. See id. at 6. Indeed, the court observed that "[a] contrary

36

result would effectively make it impossible for a plaintiff to even seek review of the Forest Service's compliance with a Forest Plan." Id. As noted above, we essentially adopt the same rationale for allowing Appellees to proceed in this case and to challenge the Forest Service's actions with respect to the Texas National Forests.[33]

## IV

### A

In Sierra Club I, we implied that the NFMA has a substantive component. See Sierra Club I, 38 F.3d at 800. We found that the approval of even-aged management techniques were within the discretion of the Forest Service. See id. This court reasoned that the Forest Service could take actions anywhere along the continuum between "preservation of the status quo" on one end and "eradication of species" on the other. Allowing even-aged management was just such a discretionary action. This discretion is not, however, "unbridled." Id. We also warned that "[t]he regulations implementing NFMA provide a minimum level of protection by mandating that the Forest Service manage fish and wildlife habitats to insure viable populations of species in planning areas. In addition, the statute requires the Forest Service to "provide for diversity of plant and animal communities." Id. (citations omitted). Consequently, this court has already determined that the NFMA and its

---

[33] The dissent's effort to distinguish Martin falters significantly. Reasoning that "the plaintiffs [in Martin] did not seek a judicial audit of the Forest Service's practice in Georgia' national forests, but challenged site-specific actions that corresponded to particular agency actions," post at 9, the dissent chastises Appellees here, who, they aver, failed to identify such an action on which to ground their claim. This softshoe approach hardly amounts to distinction. Indeed, instead of distinguishing the cases, the dissent merely argues that the cases are different without ever explaining how the challenges to particular sales in Martin differed from the challenges to particular sales in the case *sub judice*. As we have noted above, Appellees did point to specific actions, including the failure to apply the NFMA and its attendant regulations on the ground, *see infra* Part IV, that were final actions (or in some cases, *inaction*) by the Forest Service sufficient to confer jurisdiction on the district court.

associated regulations require the Forest Service to comply with the law on-the-ground rather than merely issuing standards and guidelines as part of its LRMPs.

For the Timber Intervenors to argue that the NFMA is a procedural statute only is disingenuous.[34] While this court did not specifically refer to the NFMA as a substantive statute in its Sierra Club I analysis, that panel readily admitted that the NFMA has "substantive requirements" in its lengthy discussion of the requirements to which the Forest Service must adhere. See Sierra Club I, 38 F.3d at 800-02. The NFMA and its associated regulations require the Forest Service, *inter alia*, to "provide for diversity of plant and animal communities." See 16 U.S.C. § 1604(g)(3)(B).

## B

Having determined that the taking of evidence was appropriate under the APA, the question whether the injunction was properly issued is still before us. The Forest Service implicitly recognizes that the real fight in this case is over whether the trial should have occurred in the first place. In its opening brief, the Forest Service devotes one sentence and no argument to its request that the injunction be vacated. The Timber Intervenors make a larger issue of the injunction's propriety, particularly urging that, since the Fifth Circuit has disallowed even-aged management injunctions in other cases, see Sierra Club I, 38 F.3d at 803; Texas v. United States Forest Serv., 805 F.2d 524 (5th Cir. 1986) (per curiam); Texas Comm. on Natural Resources v. Bergland, 573 F.2d 201, 212 (5th Cir. 1978), it must vacate the injunction in the instant case.

The Timber Intervenors' cases do not truly support its position, however. In Texas, the Forest Service had neglected to file an EIS regarding a proposed clearcutting project, but we refused to

___

[34]NEPA, 42 U.S.C. §§ 4321-4347, by contrast, *is* a procedural statute, mandating only that the Forest Service follow a particular process—the compilation of Environmental Impact Statements ("EIS"). See Sierra Club I, 38 F.3d at 796.

allow a stay prohibiting the clearing because the project involved "pure management of the natural resource" under NEPA, a planning statute, and not the introduction of a "foreign" element into a natural environment. Texas, 805 F.2d at 527. While the instant case does not involve any "foreign" elements either, the district court found that the Forest Service's actions violated a substantive statute, not the planning requirement forsaken by simply failing to file an EIS, and rose to the level of irreparable injury. In Bergland, this court also allowed the Forest Service to employ even-aged management techniques, but cautioned that such techniques may be used "only where [they are] essential to accomplish the relevant forest management objectives." Bergland, 573 F.2d at 210. There is no evidence in the briefs or in the lower court opinion establishing that even-aged techniques are "essential" to National Forest management in the instant matter.

Ultimately, Sierra Club I guides our decision in the instant case. In that case, this court ruled that even-aged management is one of several viable alternatives that the Forest Service may choose for timber management. See Sierra Club I, 38 F.3d at 800. Indeed, contrary to the district court's finding in that case, even-aged management is not the "exception to the rule of uneven-aged management;" the NFMA, this court found, does not express a preference for uneven-aged techniques, see id. at 799, and does not prohibit the use of even-aged timber management, see id.

The Timber Intervenors would have Sierra Club I stand for the proposition that any injunction against even-aged management is automatically invalid, since the Sierra Club I court deferred to the Forest Service's judgment in using even-aged management. They are, however, incorrect according to a careful reading of Sierra Club I and an examination of the district court's opinion in the instant case. In Sierra Club I, the court vacated the injunction at least in part because it determined that the Forest Service had complied with the NFMA and its attendant regulations. See id. at 801-02. The

39

Forest Service had compiled the appropriate statistics and taken into consideration the effects of even-aged management on the resources and biodiversity of the land that it proposed to clear-cut. See id. By contrast, the district court in this case found that the Forest Service had *not* complied with the NFMA and had not protected soil and watershed resources or inventoried and monitored other natural resources. See Sierra Club v. Glickman, 974 F. Supp. at 911. Consequently, the district court enjoined the timber harvesting activities only until such time as the Forest Service demonstrates compliance with the NFMA and its regulations "on-the-ground." See id. at 912. This action is clearly in step with Sierra Club I because it does not seek permanently to enjoin the use of even-aged management or to substitute the opinion of the court on the desirability of even-aged management for that of the agency. The opinion of the district court merely requires the Forest Service to comply with NFMA regulations before it proceeds with even-aged management in this particular part of the Texas National Forests.

The injunction is therefore proper. The district court, in an exhaustive opinion thoroughly grounded in scientific evidence, found that each of the requirements for obtaining an injunction had been met: likelihood of success on the merits, irreparable injury in the absence of the injunction, no substantial harm to the other party, and service of the public interest. See id. at 943-45. While each of these points is certainly debatable, the district court did not abuse its discretion in holding that Appellees had carried their burden. Indeed, the fact that both sides to the argument are cogent and potentially persuasive is proof that the injunction need not be vacated for abuse of discretion.

## V

Having completed a "thorough, probing, in-depth review" of relevant precedent pertaining to this case, Overton Park, 401 U.S. at 415, we conclude that the district court's actions in the case before

us were proper and, indeed, comport with the duties of a reviewing court as laid out by the Supreme Court's seminal decisions in this area.  Consequently, we AFFIRM the judgment of the district court in all respects.

EMILIO M. GARZA, Circuit Judge, dissenting:

The plaintiffs in this case—the Sierra Club, the Wilderness Society, and the Texas Committee on Natural Resources (collectively "the Environmentalist Groups")—have not identified a "final agency action" subject to judicial review. Without a final agency action, the district court lacked jurisdiction to review the Environmentalist Groups' claims. Accordingly, I dissent.

I

In light of the majority's lengthy discussion of the history of forest management, and its extensive analysis of administrative and constitutional law, it is important to emphasize what this case is not about. This case is not about whether the Environmentalist Groups have Article III standing. This case has nothing to do with the well-pleaded complaint rule. And, despite the majority's characterization of this dissent, this case does not implicate the so-called "record rule."

It is also important to describe what the Environmentalist Groups' complaint alleges. The Environmentalist Groups have not challenged a site-specific timber sale. Nor have they challenged the Forest Service's Land Resource Management Plan ("LRMP"). Rather, they complain generally about the Forest Service's timber harvesting practices and the effects of these practices over the last twenty years. They specifically allege that, in violation of the National Forest Management Act ("NFMA") and its attendant regulations, the Forest Service has failed to protect key resources and to provide for diversity of plant and animal species in Texas's national forests.[35]

_____

[35] Before the district court, the Environmentalist Groups also alleged that the Forest Service failed to keep current and adequate inventories and monitoring data on key resources in Texas's national forests. The district court agreed with the Environmentalist Groups, concluding that the Forest Service had failed to meet its inventorying and monitoring obligations. The Forest Service has not appealed the district court's ruling on this issue. Accordingly, this issue is not properly before

-42-

Given the posture of this case, we are faced with only one issue: Did the district court have jurisdiction to review the Environmentalist Groups' broad challenge to the Forest Service's management of Texas's national forests? It is on this issue that the majority and I disagree.

II

The NFMA does not provide for judicial review of Forest Service decisions, and therefore, the general review provisions of the Administrative Procedure Act ("APA") apply by default. *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."). The APA imposes limits on a district court's review of agency action. For example, if a plaintiff seeks review under the APA then the "agency action in question must be [a] 'final agency action.'" *Lujan v. National Wildlife Fed.*, 497 U.S. 871, 882, 110 S. Ct. 3177, 3185, 111 L. Ed. 2d 695, __ (1990). For an agency action to be "final," it "must mark the consummation of the agency's decisionmaking process," and "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v Spear*, 520 U.S. 154, 177, 117 S. Ct. 1154, 1168, 137 L. Ed. 2d 281, __ (1997) (citations and internal quotation marks omitted). "If there is no 'final agency action' . . . [then] a court lacks subject matter jurisdiction." *American Airlines, Inc. v. Herman*, 176 F.3d 283, 287 (5th Cir. 1999); *see also Wilderness Soc'y v. Alcock*, 83 F.3d 386, 388 n.5 (11th Cir. 1996) (noting that courts have jurisdiction "over a challenge under the NFMA only if the agency action is final").

In *Lujan v. National Wildlife Federation*, 497 U.S. 871, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990), the Supreme Court elaborated on the limits to judicial review under the APA. The plaintiffs in *Lujan* averred that the Department of Interior's "land withdrawal program," which made over 160

us on appeal. *See, e.g., Hawaii v. Standard Oil Co. of California*, 405 U.S. 251, 257 n.6, 92 S. Ct. 885, 888 n.6, 31 L. Ed. 2d 184, __ (1972) ("Since the ruling was not appealed it is not before the Court for review.").

million acres of federal land available for commercial use, violated the Federal Land Policy Management Act and the National Environmental Policy Act. The Court upheld the district court's grant of summary judgment in favor of the defendants for two reasons. First, the Court held that the plaintiffs lacked standing because they had not alleged specific facts showing that they were actually affected or aggrieved by agency action. *See id*. at 882-90, 110 S. Ct. at 3185-90. Second, the Court held that the plaintiffs' claims were not entitled to judicial review because the challenged "land withdrawal program" was not "an identifiable action or event," and therefore, did not constitute a "final agency action" under the APA. *Id*. at 899, 110 S. Ct. at 3194.

In discussing the APA's finality requirement, the Court emphasized that because the plaintiffs had brought a "generic challenge" to all aspects of the "land withdrawal program," they had failed to direct their attack against a particular final agency action. *Id.* at 891, 110 S. Ct. at 3190. In reaching this conclusion, it admonished the lower courts to adhere to their traditional institutional role:

> Except where Congress explicitly provides for our correction of the administrative process at a higher level of generality, we intervene in the administration of the laws only when, and to the extent that, a specific "final agency action" has an actual or immediate threatened effect. Such an intervention may ultimately have the effect of requiring a regulation, a series of regulations, or even a whole "program" to be revised by the agency in order to avoid the unlawful result that the court discerns. But it is assuredly not as swift or as immediately far-reaching a corrective process as those interested in systemic improvements would desire. Until confided to us, however, more sweeping actions are for the other branches.

*Id*. at 894, 110 S. Ct. at 3191. Thus, the Court established a presumption in favor of case-by-case adjudication on the concrete facts of specific agency decisions, and against challenges seeking programmatic improvements to the administrative process as a whole. *See id*. at 890-94, 110 S. Ct. at 3189-92.

A review of the pleadings in this case shows that the Environmentalist Groups have not directed

-44-

their challenge against a particular final agency action. The Forest Service's alleged failure to implement timber sales in compliance with the NFMA neither constitutes "an identifiable action or event," *id.* at 899, 110 S. Ct. at 3194, nor "mark[s] the consummation of the agency's decisionmaking process," *Bennett*, 520 U.S. at 178, 117 S. Ct. at 1168. Instead, it reflects the cumulative effect of the many individual timber sales approved by the Forest Service since the NFMA became law in 1976. Logging pursuant to these past sales has occurred. Thus, having foregone a direct challenge to these sales,[36] the Environmentalist Groups now seek a judicial audit of the effects of the Forest Service's timber management practices over the last twenty years. As *Lujan* makes clear, this generic challenge is not reviewable under the APA. *See Lujan*, 497 U.S. at 890-94, 110 S. Ct. at 3189-92.

The majority asserts that *Lujan*'s reasoning does not preclude review of the Environmentalist Groups' complaint because the Environmentalist Groups have "alleged particularized injury and supported their allegations with voluminous evidence of individualized harm." According to the majority, the Environmentalist Groups have not made a generic challenge to Forest Service practices, but instead have "pointed to specific activities on specific plots in specific National Forests." The majority, however, conflates the standing requirements of Article III with *Lujan*'s discussion of the APA's "final agency action" requirement. *See Bennett v. Spear*, 520 U.S. 154, 177, 117 S. Ct. 1154, 1168, 137 L. Ed. 2d 281, __ (1997) (noting that "the question of whether the Secretary's action is final . . . [should not be confused with the] separate question of whether the petitioners' harm is

_____

[36] Any direct challenge to these timber sales would now be moot. *See Florida Wildlife Fed'n v. Goldschmidt*, 611 F.2d 547, 549 (5th Cir. 1980) ("Where the activities sought to be enjoined have already substantially occurred and the appellate court can not undo what has already been done, the action is moot.").

'fairly traceable' to the Secretary's action"); *Catron County Bd. of Comm'rs v. United States Fish and Wildlife Serv.*, 75 F.3d 1429, 1434 (10th Cir. 1996) ("In addition to Article III standing requirements, a plaintiff seeking review pursuant to the APA must [] identify some final agency action . . . [that] form[s] the basis of its claims.").

Although the Environmentalist Groups may have Article III standing, we nonetheless must decide whether they have identified a final agency action for review or whether their challenge to the Forest Service's timber management practices is generic.[37] *See Catron*, 75 F.3d at 1434. Allegations of "particularized injury" and "voluminous evidence of individualized harm" are not dispositive as to whether jurisdiction exists to review the Environmental Groups' challenge. In *Lujan*, even though the plaintiffs referenced "many individual actions . . . in the[ir] complaint," "the flaws in the entire '[land withdrawal] program' . . . [could not] be laid before the courts for wholesale correction under the APA." *Lujan*, 497 U.S. at 893, 110 S. Ct. at 3190-91. Thus, as *Lujan* shows, to determine whether the Environmentalist Groups' challenge is generic, we should not focus on the evidence that they marshal in support of their challenge—the "many individual actions referenced in the[ir] complaint" are not relevant. *Id*. Instead, we must examine the "particular agency action" that the

---

[37] A plaintiff must meet three requirements to establish Article III standing:
  First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."
*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351, __ (1992). A plaintiff, of course, may establish Article III standing without also satisfying statutorily imposed standing requirements. *See Steel Co. v. Citizens for a Better Environment*, __ U.S. __, __, 118 S.Ct. 1003, 1013, 140 L.Ed.2d 210, __ (1998) (discussing both Article III and statutory standing).

Environmentalist Groups have challenged. *Id.* at 891, 110 S. Ct. at 3190. Again, a review of the pleadings shows that the Environmentalist Groups have not directed their attack against a final agency action.[38]

Perhaps in recognition that the Environmentalist Groups have not identified a particular agency decision, the majority also concludes that the Forest Service's alleged failure to comply with the NFMA and its attendant regulations constitutes a "failure to act." I agree that under certain circumstances, agency inaction may be sufficiently final to make judicial review appropriate. *See Sierra Club v. Thomas*, 828 F.2d 783, 792-98 (D.C. Cir. 1987) (discussing different forms of agency inaction). The Forest Service's alleged failure to maintain Texas's national forests, however, does not reflect agency inaction. As Judge Williams explained in *Public Citizen v. Nuclear Regulatory Commission*:

---

[38]    The majority concludes that the Forest Service's failure to maintain Texas's national forests constitutes an adjudication under the APA. It reasons that "by process of elimination the decision not to follow the regulations was clearly not a rulemaking, so must therefore be an adjudication." There are several difficulties with the majority's reasoning. First, as the majority admits, none of the parties argue that the Forest Service's alleged failure to comply with the NFMA and its regulations constitutes an adjudication. Second, the majority's logic presumes that a final agency action occurred. As discussed above, however, neither the majority nor the Environmentalist Groups have identified a concrete decision made by the Forest Service not to comply with its statutory or regulatory mandates. *See Bricklayers, Masons & Plasterers Int'l Union of Am. v. NLRB*, 475 F.2d 1316, 1319 (D.C. Cir. 1975) ("[A]djudication does not encompass all forms of agency action other than rulemaking. If the action in question does not lead to a 'final disposition' by the agency, it may not be an adjudication."). Third, the Forest Service's actions do not fit within any accepted definition of the term "adjudication." An adjudication "implies a hearing . . . after notice, of legal evidence on the factual issues) involved." BLACK'S LAW DICTIONARY 42 (6th ed. 1990). It is "'individual in impact and condemnatory in purpose,' directed to the determination of the legal status of particular persons or practices through the application of preexisting legal standards." *FTC v. Brigadier Indus. Corp.*, 613 F.2d 1110, 1117 (D.C. Cir. 1979). Unlike a rulemaking, which involves the promulgation of policy-type rules or standards, an adjudication is a "proceeding designed to adjudicate disputed facts in particular cases." *United States v. Florida E. Coast Ry.*, 410 U.S. 224, 245, 93 S. Ct. 810, 821, 35 L. Ed. 2d 223, __ (1973).

Whatever the hypothetical strength of petitioners' theory, it has no application here. The agency had acted. Its Policy Statement is a formal product of the Commission. . . . Petitioners just do not like what the Commission did.

. . . .

Our acceptance of petitioners' argument would make a nullity of statutory deadlines. *Almost any objection to an agency action can be dressed up as an agency's failure to act.* We can imagine situations where an agency's effort to comply was so flimsy or unpublicized that affected parties could not be expected to grasp that it was *attempted compliance*. But this is not such a case.

845 F.2d 1105, 1108 (D.C. Cir. 1988) (emphasis added). In this case, the Forest Service has not failed to issue a LRMP or to conduct timber sales. Moreover, the Environmentalist Groups have not argued that the Forest Service has not *attempted* to comply with the NFMA and its regulations. In short, the Forest Service has not failed to act.[39]

I disagree with the majority that preventing the Environmentalist Groups from challenging the general effects of the Forest Service's timber management practices would mean that there would never be an "opportunity to challenge a timber sale resulting from even-aged timber management." If the Environmentalist Groups believe that any particular proposed even-aged timber sale will result in NFMA and regulatory violations, then they may file an action challenging the Forest Service's decision to proceed with the sale. *See Ohio Forestry Ass'n, Inc. v. Sierra Club*, __ U.S. __, __, 118 S. Ct. 1665, 1670, __ L. Ed. 2d __, __ (1998) (holding a challenge to the lawfulness of the Forest Service's LRMP not justiciable) ("[B]efore the Forest Service can permit logging, it must focus upon a particular site, propose a specific harvesting method, prepare an environmental review, permit the public an opportunity to be heard, and (if challenged) justify the proposal in court."). Judicial review would then take place with the "benefit of the focus that a particular logging proposal could provide."

---

[39]    It is worth remembering that the plaintiffs in *Lujan* also alleged that the agency had violated its statutory mandates. *See Lujan*, 497 U.S. at 879, 110 S. Ct. at 3183-84. The Court in *Lujan*, however, did not conclude that the agency had failed to act.

*Id.* at 1672.

The Eleventh Circuit's recent opinion in *Sierra Club v. Martin*, 168 F.3d 1 (11th Cir. 1999), to which the majority cites, demonstrates how environmentalist groups may legitimately challenge the Forest Service's timber management practices. Contrary to the majority's assertion, that case is not "identical" to this one. In *Martin*, the Forest Service approved timber sales for seven tracts of land in the Chattahoochee and Oconee National Forests in Georgia. The plaintiffs filed suit, contending that the "timber cutting projects would harm plant and animal species in the Forest," and that the "proposed clearcutting" would not adequately protect the Forest's key resources. *Id.* at 3. Unlike the Environmentalist Groups in this case, the plaintiffs did not seek a judicial audit of the Forest Service's practices in Georgia's national forests, but challenged site-specific actions that corresponded to particular agency decisions.[40] Thus, unlike the Environmentalist Groups in this case, the plaintiffs in *Martin* identified a final agency action subject to judicial review.

I appreciate that requiring plaintiffs to bring challenges to individual timber sales before logging occurs places a higher burden on environmentalist groups wishing to monitor Forest Service management practices; however, as the Court noted in *Lujan*, judicial review of only final agency actions "is the traditional, and remains the normal, mode of operation of the courts." *Lujan*, 497 U.S. at 894, 110 S. Ct. at 3191. Courts are not equipped to resolve the technical issues involved in agency decisionmaking at "a higher level of generality." *Id*. As the Seventh Circuit has explained:

Administrative agencies deal with technical questions, and it is imprudent for the generalist

---

[40] As the majority notes, the Eleventh Circuit held that the plaintiffs could challenge the Forest Service's compliance with its LRMP as part of their challenge to site-specific timber sales. *See Martin*, 168 F.3d at 6. We do not need to consider whether the Eleventh Circuit's holding is correct because the Environmentalist Groups in this case have challenged neither a site-specific timber sale nor the Forest Service's LRMP.

judges of federal district courts and the courts of appeals to consider testimonial and documentary evidence bearing on those questions unless the evidence has first been presented and considered by the agency. Trees may seem far removed from the arcana of administrative determination, but one has only to glance at the documents submitted in this case to realize that "silviculture" is in fact a technical field, and not just one with a dry and forbidding vocabulary.

*Cronin v. United States Dept. of Agric.*, 919 F.2d 439, 444 (7th Cir. 1990). Wholesale improvement to the Forest Service's management of the national forests is best sought in the "offices of the [Department of Agriculture] or the halls of Congress, where programmatic improvements are normally made." *Lujan*, 497 U.S. at 891, 110 S. Ct. at 3190. Until confided to the courts, the "more sweeping actions" are reserved for the other branches of government. *Id.*

III

The district court lacked jurisdiction to review the Environmentalist Groups' broad challenge to the Forest Service's management of Texas's national forests. The majority's opinion ignores the important limits on judicial review that define the role of courts in our modern administrative state. In doing so, it undermines the purpose behind Congress's enactment of the NFMA—that is, to "get the practice of forestry out of the courts and back to the forests." *See* 122 Cong. Rec. 33835 (Sept. 30, 1976) (remarks made during the adoption of the Conference Report by the NFMA's sponsor, Sen. Humphrey). Accordingly, I dissent.